David CARSON *v.* STATE of Arkansas

CR 04-863                                             211 S.W.3d 527

Supreme Court of Arkansas
Opinion delivered July 1, 2005

*David L. Dunagin*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Laura Shue*, Ass't Att'y Gen., for appellee.

Tom Glaze, Justice. Appellant David Carson was charged with manufacturing methamphetamine, a Class Y felony, after Officer Will Dawson of the Greenwood Police and the Twelfth and Twenty-First Judicial Drug Task Force conducted a search of Carson's home and discovered a methamphetamine laboratory. With the consent of the State and the court, Carson entered a conditional plea of guilty to a lesser charge of conspiracy to manufacture methamphetamine, a Class A felony. The trial court sentenced Carson to four years' imprisonment, with an additional six years suspended. On appeal, Carson argues that the trial court erred in denying his motion to suppress the evidence seized as a result of the search of his home, which Officer Dawson conducted as a "knock-and-talk" encounter.

In his sole point on appeal, Carson argues that the trial court should have suppressed the evidence seized as a result of what Carson contends was an illegal search. In an appeal from the denial of a motion to suppress, this court conducts a *de novo* review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court. *Davis v. State*, 351 Ark. 406, 94 S.W.3d 892 (2003).

A warrantless entry into a private home is presumptively unreasonable under the Fourth Amendment and Article 2, § 15 of the Arkansas Constitution. *Katz v. United States*, 389 U.S. 347 (1967); *Griffin v. State*, 347 Ark. 788, 67 S.W.3d 582 (2002). However, the presumption of unreasonableness may be overcome if the law enforcement officer obtained the consent of the home-

owner to conduct a warrantless search. *Stone v. State*, 348 Ark. 661, 74 S.W.3d 591 (2002); *Holmes v. State*, 347 Ark. 530, 65 S.W.3d 860 (2002); Ark. R. Crim. P. 11.1. This court has established that the State has a heavy burden to prove by clear and positive testimony that a consent to search was freely and voluntarily given. *Holmes v. State, supra; Norris v. State*, 338 Ark. 397, 993 S.W.2d 918 (1999).

A valid consent to search must be voluntary, and until recently, this court had held that "[v]oluntariness is a question of fact to be determined from all the circumstances." *Stone*, 348 Ark. at 669 (citing *Ohio v. Robinette*, 519 U.S. 33 (1996), and *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)). In the same vein, this court had held that whether or not a person had been informed of his or her right to refuse consent was but one factor to consider in determining whether that person's consent was voluntary. *See, e.g., King v. State*, 262 Ark. 342, 557 S.W.2d 386 (1977).

However, in *State v. Brown*, 356 Ark. 460, 156 S.W.3d 722 (2004), this court was presented with the question of whether law enforcement officers were required to inform a homeowner of his or her right to refuse to consent to a search of the home. *Brown*, like the instant case, involved the issue of the police procedure called a "knock-and-talk." The knock-and-talk, as a police investigative procedure, is a tactic used by police officers when they do not have sufficient probable cause to obtain a search warrant. What generally occurs is that law enforcement officers get information that a certain person has drugs in a residence, but the officers do not have probable cause for a search warrant. The officers then proceed to the residence, knock on the door, and request consent to search that home. In some instances, the officers will tell the person that they are investigating information they received that drugs are in the house. If an oral consent is given, the search proceeds. Whatever evidence is found by police officers during that consensual search may then form the basis for probable cause to obtain a search warrant and result in the subsequent seizure of contraband. *See Brown*, 356 Ark. at 466, 156 S.W.3d at 726; *Scott v. State*, 347 Ark. 767, 67 S.W.3d 567 (2002).

This court has held that the knock-and-talk procedure does not *per se* violate the Fourth Amendment. *See Scott, supra.* However, in *Brown*, this court specifically held that, under Article 2, § 15 of the Arkansas Constitution, officers who utilize the

technique are required to inform the home dweller that he or she has the right to refuse to consent to the search. *Brown*, 356 Ark. at 474; *see also Woolbright v. State*, 357 Ark. 63, 160 S.W.3d 315 (2004) (reversing and remanding for suppression of all evidence where it was undisputed that the investigating officers did not inform defendant of his right to refuse consent).

In the present case, Carson argues that the evidence seized as the result of Officer Dawson's search should have been suppressed because Dawson never informed him of his right to refuse consent. At the suppression hearing, Dawson testified that he had received a phone call from a store in Fort Smith that Carson had purchased strong iodine tincture, an item used in the manufacture of methamphetamine. In response to the phone call, Dawson traveled alone to Carson's residence on Johnson Street in Fort Smith about 11:00 in the morning. Dawson was dressed in a pair of jeans and a t-shirt, and was driving an unmarked Dodge pick-up truck. Although the officer was carrying a weapon, it was not visible.

Dawson went to the door and knocked. When Carson came to the door, Dawson pulled out his badge, identified himself as a police investigator, and asked Carson if he could step inside to speak with him. Carson replied that he was a little busy, but he could step outside to speak with Dawson. Dawson thought it was odd that Carson was too busy to let Dawson in, but could come outside to speak. Dawson also noticed that Carson was sweating, had trouble making eye contact, and was shaking. Dawson immediately started to point out evidence that he had heard and observed, such as the iodine purchase; Dawson also mentioned the strong chemical odor in the air, and the fact that Carson's hands looked like they were stained. As Dawson pointed out to Carson "everything [he] could see that [he] thought would relate to the manufacturing of methamphetamine," Carson broke down and began to cry, telling Dawson that the officer was correct, that he did have a lab inside, and that he would show Dawson where everything was.

Dawson testified that the only thing he asked Carson when he first got there was if he could speak with Carson. Dawson did not mention anything about a search, and he did not ask again. According to Dawson's testimony, Carson invited Officer Dawson inside his home without Dawson's asking. In response to Carson's revelation about the lab, Dawson followed him inside the house, where Dawson saw in plain view items used to manufacture methamphetamine. At that time, Dawson placed Carson into

custody. Later that day, Carson gave a statement to the police in which he again confessed that he was manufacturing methamphetamine.

On cross-examination, Dawson testified that he did not seek a warrant before going to Carson's house because he did not have a reason to seek one at that time. Dawson stated that his intent in going to Carson's house was "to do a knock and talk"; he was expecting Carson to come to the door, at which point Dawson was going to talk to him about the iodine purchase and question him about whether or not it was being used to manufacture methamphetamine. Dawson conceded that he never asked Carson's consent or permission to search his house or go into his house to search. Dawson further stated that he "never used the words that [Carson] had the right to refuse to let [Dawson] inside."

The trial court ruled that the facts of the instant case were distinguishable from *Brown*, stating as follows:

> [*Brown*] talks about several uniformed officers descending on the house, as I recollect, and contrast that with the one officer [in this case] in jeans and a T-shirt. And this *Brown* case might have been applicable if after all of this Officer Dawson would have said, again, I request your consent to come into your house now so that I can search. And then if the defendant said, well, okay, now that you've pointed out all of this, I guess so. I believe the officer's testimony that they were talking and the defendant broke down in tears and said let me show you where everything is. I think on those facts, this [*Brown*] case does not apply to make the search unconstitutional, so the motion [to suppress] is going to be denied.

Carson argues that Dawson failed to comply with this court's holding in *Brown*, because he never explicitly advised Carson of his right to refuse to consent. He asserts that he had an expectation of privacy in his home, and that he "implicitly told . . . Officer [Dawson] he could not enter the residence when he [Carson] came out and shut the door to the residence." He claims the evidence showed that no warning regarding his right to refuse consent was ever given to him; therefore, Carson concludes, the trial court erred by not applying the holding of *Brown*.

*Brown* involved three drug task force agents who approached the house of appellant Brown at about ten o'clock in the morning. When Brown opened the door, the officers told her that they had information that someone was possibly growing marijuana there or

that there was other illegal drug use at the residence. Brown signed a consent-to-search form, and the officers entered the house. At the suppression hearing, Brown testified that she signed the consent form because she thought she had to and that she "had no choice but to sign it," adding that "she did not know that she could say 'no' and not sign it." *Brown*, 356 Ark. at 464. The trial court granted her motion to suppress, finding that the officers should have informed Brown that she could have refused consent. *Id.* at 465.

In affirming, the *Brown* court noted that it was the "intimidation effect of multiple police officers appearing on a home dweller's doorstep, sometimes in uniform and armed, and requesting consent to search without advising the home dweller of his or her right to refuse consent that presents the constitutional problem." *Id.* at 466. Relying on Arkansas' "heightened privacy protection for citizens in their homes against unreasonable searches and seizures," *id.* at 469, the court concluded that a warrantless search, conducted in the absence of a warning to the resident of his or her right to refuse consent, violated the home-dweller's right against warrantless intrusions into the home, as guaranteed by Article 2, § 15 of the Arkansas Constitution. *Id.* at 474.

In *Brown*, this court declared a bright-line rule: when an officer does not inform a suspect of his or her right to refuse consent, any subsequent search — even one based on the suspect's apparent consent — is invalid. In addition, Ark. R. Crim. P. 11.1 was amended in November of 2004 to reflect this court's holding in *Brown*. Subsection (c) of that rule now explicitly provides that "[a] search of a dwelling based on consent *shall not be valid* under this rule *unless the person giving the consent was advised of the right to refuse consent.*" *See In Re Rules of Criminal Procedure* (Ark. Appx. Nov. 18, 2004) (emphasis added). In the instant case, Officer Dawson conceded at the suppression hearing that he never advised Carson of his right to refuse to consent to the search. Therefore, the search of the house was invalid, and the trial court erred in denying Carson's motion to suppress.

The State raises an alternative argument wherein it asserts that the search can still be found to be valid, because the search occurred before this court decided *Brown* and before Rule 11.1 was amended. The search in this case occurred on July 26, 2003; *Brown* was not decided until March 25, 2004, and Rule 11.1 was amended in November of 2004. However, in *Woolbright, supra,*

this court relied on *Brown* to reverse the trial court's denial of a suppression motion where the suspect had not been advised of his right to refuse consent; in that case, as in this one, the search occurred before this court decided *Brown*. To reach a different result today would call the holding in *Woolbright* into question, and we decline to do so.

CORBIN, DICKEY, and GUNTER, JJ., dissent.

JIM GUNTER, Justice, dissenting. I respectfully dissent. In his sole point on appeal, Carson argues that the trial court should have suppressed the evidence seized as a result of what Carson contends was an illegal search. The majority agrees and reverses Carson's conviction because Officer Dawson did not specifically inform Carson that he had the right to refuse to consent to a search of his home.

The majority relies upon our decision in *State v. Brown*, 356 Ark. 460, 156 S.W.3d 722 (2004), in which we held that Article 2, § 15 of the Arkansas Constitution requires officers who use the knock-and-talk procedure to inform the home dweller that he or she has the right to refuse to consent to the search. This holding is now reflected in Ark. R. Crim. P. 11.1, which was amended in November, 2004. In *Brown,* we noted that it was the "intimidation effect of multiple police officers appearing on a home dweller's doorstep, sometimes in uniform and armed, and requesting consent to search without advising the home dweller of his or her right to refuse consent that presents the constitutional problem." *Id.* at 466. Relying on Arkansas's "heightened privacy protection for citizens in their homes against unreasonable searches and seizures," *id.* at 469, the court concluded that a warrantless search, conducted in the absence of a warning to the resident of his or her right to refuse consent, violated the Arkansas Constitution. *Id.* at 475.

The facts in this case are distinguishable from those in *Brown, supra.* While there were three uniformed officers present in *Brown*, the only officer present in this case was Officer Dawson, and he was not in a uniform, but in jeans and a t-shirt. Moreover, the search in this case was not conducted after Dawson asked consent to search, but after a conversation between Dawson and Carson on the porch during which Carson broke down crying and offered to show Dawson the meth lab inside the house. Additionally, the circumstances in *Brown* involved a level of coercion that was not present in the present case. There were three agents in *Brown* who

told Brown they had reason to believe that there was illegal drug use, and that all three officers were going to search the premises. Here, Officer Dawson, wearing jeans and a t-shirt, went to Carson's front door, and Dawson was alone when he asked to speak to Carson. Unlike the situation in *Brown*, Carson exercised his right to refuse consent when, on his own volition, he stepped out onto the front porch and denied the officer permission to enter his home. Having initially refused consent, however, Carson very shortly thereafter granted Dawson permission to enter the home without Dawson's ever asking again if he could enter.

This court has said that the knock-and-talk procedure has been upheld as a consensual encounter and a valid means to request consent to search a house. *Latta v. State*, 350 Ark. 488, 88 S.W.3d 833 (2002). In *Latta*, we held that the police officers' actions of going to appellant's house based upon an anonymous tip that he was manufacturing methamphetamine did not violate his Fourth Amendment rights. *Id.* We should similarly hold in this case. Officer Dawson's actions do not violate what we have defined as the knock-and-talk procedure:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal *per se*, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's castle with the honest intent of asking questions of the occupant thereof whether the questioner be a pollster, a salesman, or an officer of the law.

*Keenom v. State*, 349 Ark. 381, 387, 80 S.W.3d 743, 746 (2002) (citing *Griffin, supra*)).

Here, there was no overbearing police conduct, no entry, no disparity in numbers of officers, and no conduct that is offensive to the average person. The factor relied on by the majority is that the officer did not tell the meth maker, as he was inviting the officer to "see everything," that he did not need to consent. Rule 11.1 does not purport to cover a person who chooses to come out of his home to talk with a lone police officer and who, on his own volition, volunteers information that he has methamphetamine or other illegal drugs inside. Clearly, Carson's admission at this stage of the inquiry gave the officer probable cause to enter the suspect's meth lab. Any warning after his confession would be of little value to Carson.

The majority stands on *Brown* and on Rule 11.1. Neither should cause the court to ignore reason. No one can write a rule to cover every possible situation. And surely neither Rule 11.1 nor *Brown* were written to protect a confessed, meth-lab owner-operator who invited a lone police officer inside his home to see his operation. Surely this court's duty to the law-abiding citizens of Arkansas cannot be justified on such a basis. If the reason for *Brown* and Rule 11.1 were such, then both should be abandoned.

For these reasons, I respectfully dissent. I am authorized to state that Justice Corbin and Justice Dickey join in this dissent.