Cite as 2020 Ark. App. 314

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CR-19-780

| | |
|---|---|
| RUFUS LAMONT VIRGIL | **Opinion Delivered** May 20, 2020 |
| APPELLANT | APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT [NO. 23CR-18-80] |
| V. | |
| STATE OF ARKANSAS | |
| APPELLEE | HONORABLE CHARLES E. CLAWSON, JR., JUDGE |
| | REVERSED AND REMANDED |

## BRANDON J. HARRISON, Judge

Does this court treat one of Arkansans' state constitutional rights as seriously as the Arkansas Supreme Court has for the past fifteen plus years? It does, as it must, and today we remind all who are interested that Arkansans' right to be free from an unreasonable search of their homes is alive, well, and robust. Specifically, we reaffirm the bright-line rule that law enforcement must inform citizens of their right to refuse a warrantless search of their homes *before* an officer may enter, *not after* the warrantless entry has already occurred, as happened in this case.

This case ended in the circuit court with Rufus Virgil's conviction for failing to comply with sex-offender registration-and-reporting requirements. Ark. Code Ann. § 12-12-904 (Supp. 2019). It began, in an important sense, when the Conway Police Department engaged a young woman named Dejah Felton at her apartment on 4 January 2018. On that day, some plain-clothes and uniformed police officers knocked on Felton's door and

immediately told her they wanted to talk with her. The knocking officer asked if they could come inside and talk. Felton let the police inside, although the split-second decision she made with multiple officers at the door's threshold cannot be termed a hearty invitation. The legality of the "knock-and-talk" with Felton is at issue in this appeal because it relates to Virgil's conviction for violating reporting-and-registration requirements, of which more later.

When properly performed, a knock-and-talk is a consensual investigative technique police use at the home of either a suspect or an individual with information about an investigation; no probable cause or a warrant is required to initiate a knock-and-talk. *See State v. Brown*, 356 Ark. 460, 466, 156 S.W.3d 722, 726 (2004) (explaining the procedure). The legality of a knock-and-talk is at issue here because Conway Police found documents with Rufus Virgil's name printed on them as well as men's personal items and clothing when they searched Felton's apartment. The State says these items support its charge that Virgil violated certain sex-offender registration-and-reporting requirements. Before the jury trial commenced, Virgil sought to suppress the listed items (and other evidence) that the Conway Police had obtained when they searched Felton's apartment.[1]

Vigil claims the way in which the knock-and-talk was done in this case violated his rights under the Fourth Amendment to the United States Constitution and article II, section 15 of the Arkansas Constitution. For the reasons discussed below, we hold that the police

---

[1]The police also recovered a firearm and other items that are not directly relevant to the sex-offender registration-and-reporting charge but are with respect to other criminal charges the State filed against Virgil in an amended criminal information. The circuit court severed the other charges from the registration-and-reporting charge.

violated Virgil's well-established right to privacy under the Arkansas Constitution. In particular, the knock-and-talk as performed in this case was an unreasonable search that is prohibited by our state constitution.

An important piece of evidence that the State introduced against Virgil during his jury trial on the sex-offender charge was a stipulation from the prior suppression hearing. During the hearing, the parties stipulated that he resided at 1618 Westlake Drive, No. 1907, on 4 January 2018. The stipulation gave Virgil standing to challenge the knock-and-talk and the fruits of that effort. Neither Virgil, nor the State, nor the court had any issue accepting and using the stipulation during the suppression hearing. Later, however, the State and Virgil disagreed on whether the residency stipulation could be used when the State sought to try and convict him on the sex-offender charge. Over Virgil's objection, the circuit court agreed with the State and allowed the jury to hear that Virgil had previously stipulated that he resided at a different address than the one he had given as a registered sex offender.

Virgil was convicted.

Regarding the stipulation's use during the jury trial, we hold that the circuit court erred when it allowed the State to use the suppression-hearing stipulation during the trial. A case decided by the Supreme Court of the United States makes the point for us. In *Simmons v. United States*, 390 U.S. 377, 394 (1968), the Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he

3

makes no objection." But that is what happened during Virgil's jury trial over his timely objection.

I. *The Knock-and-Talk Encounter as Recited During the Suppression Hearing*

What follows is a summary of the evidence received during the suppression hearing, which includes audio-visual footage that an officer's "bodycam" recorded.

An anonymous tipster contacted Conway's "Text a Tip Program" and alerted the police to possible illegal drug activity at an apartment located at 1619 Westlake Drive, No. 1907, Conway, Arkansas. That address was an apartment leased in the name of Virgil's girlfriend, Felton. Around 10:00 a.m. on 4 January 2018, Conway Police investigator Jeron Smith, who was dressed in civilian clothes, went to Felton's apartment with other uniformed and nonuniformed law enforcement officers. Felton answered the door shortly after the police knocked.

Bodycam footage played for the court during the suppression hearing showed that Investigator Smith stated, "Hey, I'm Investigator Smith with the Conway Police Department. Are you Dejah?" Felton replied, "Uh–huh." Smith then asked, "Hey, could I come in and talk to you real quick?" Felton said, "Um–hum." Smith then immediately stepped across the threshold into the apartment; one or more officers followed.

Investigator Smith also said the following during the hearing:

PROSECUTOR:     What happened when you went there [to the apartment]?

SMITH:          I knocked on the door and made contact with a Dejah Felton.

PROSECUTOR:     What happened next?

SMITH:           I asked her if we could come inside.

4

| PROSECUTOR: | What did she say? |
| SMITH: | She said we could. |
| PROSECUTOR: | What happened next? |
| SMITH: | I explained to her who we were and why we were there and basically presented her with a consent to search form. |
| PROSECUTOR: | And did she sign that consent form? |
| SMITH: | She did. |

The investigator's testimony from the stand is accurate enough relative to the video. The point that it misses, which the video makes clear, is that the "here's why we are here" and the "consent to search" issue all happened *after the officers were inside* the apartment. In fact, the officers were inside a full three or four minutes before a consent-to-search form was presented to Felton.

But we get ahead of ourselves.

The bodycam video shows that the officers asked if anyone else was in the apartment. Felton told the officers that her friend Lisa was present in the apartment; she was sleeping in the other room. An officer asked Felton about the odor of marijuana and said, "I'll be honest. We're not worried about small amounts of marijuana, paraphernalia." Felton said her friend had used it and indicated there was a small amount in her home. Investigator Smith held out what is presumably the consent form and stated:

> And that's good. The best way we can close these out, nobody ever bother you again, what we do is we always present you with a Consent to Search Form; okay? And explain it to you. There's no tricks behind. These empty blanks, they'll be filled, date, address, you will go there. This will give you—like, give us consent to search your home. The quicker we can say that we didn't find anything, nothing is here, Dejah's good, and then we can close out and no one will ever bother you again; okay?

. . . .

And—and everything on there, there's no—there's no trick to that form. Felton took the piece of paper and responded, "Can I like call my momma or something?" Investigator Smith agreed that she could call her mother, and then she stepped outside. (For accuracy's sake, it seems from the video that she may have called her mother while inside the apartment, not outside of it.) Later in the video, a uniformed officer can be seen holding a piece of paper that appears to be the consent form.

After a discussion about another occupant of the apartment, the conversation with Felton returned to consent. The officer stated, "Well, and I'll explain the process. Because there's the odor of marijuana, it's illegal and we have the right to go and apply for a search warrant; okay?" Felton's response is not audible on the recording. The officer then said:

> You can not consent today. What we have to do then is—we didn't want to do this but if we have to—clear the residence of the person and (inaudible) I would go type a search warrant and come back and—we always—.

The officer told Felton that the police were not there for "a user amounts of marijuana" but "just to make sure no one is selling marijuana." The officer told Felton, "We're not trying to trick you. I'm being very honest with you."

After having been inside Felton's apartment for ten minutes, Investigator Smith offered to call Felton's employer, Popeye's Chicken. On the video, Investigator Smith can be heard saying, "[Dejah] is not in any trouble. But she wanted me to call and let you know. …" The rest of the conversation is inaudible.

Having been engaged by the police for approximately four to five minutes, Felton apparently signed a written consent-to-search form, which states:

I, Dejah Felton, having been informed of my constitutional right not to give consent to a search made of the premises . . . without a search warrant and of my right to refuse to consent to such a search, I hereby authorize [Conway Police officers] to conduct a complete search of my premises/auto 1618 Westlake #1907.

The officers ultimately found some documents with the name Rufus Virgil, Jr., on them, male clothing and hygiene products, a .357 mag pistol, approximately one ounce of marijuana, and "several pieces of paraphernalia." Felton was arrested.

The circuit court denied Virgil's motion to motion to suppress "any items seized as a result of the illegal action[.]" Virgil appealed that denial. We will address it first and the stipulation's admission at trial second.

## II. *The Denial of Virgil's Motion to Suppress Evidence*

"A warrantless *entry* into a private home is presumptively unreasonable under the Fourth Amendment and Article 2, § 15 of the Arkansas Constitution." *Carson v. State*, 363 Ark. 158, 160, 211 S.W.3d 527, 528 (2005) (emphasis added) (internal citations omitted). Virgil contends the knock-and-talk was conducted by the Conway Police Department in an unconstitutional manner because Felton was not told of her right to refuse to allow the officers to search her apartment *before* they entered the protected space. And the remedy for this constitutional violation is to suppress the fruit of the impermissible search (and eventual seizure of items). The State relies on the consent exception to uphold the search, arguing that Virgil (the defendant) waived any protected expectation of privacy when Felton allowed the officers into her apartment and eventually signed the written consent form. The State says that the officers lawfully searched the apartment and lawfully seized contraband and other items with Felton's express permission. Our concern here is not with the knock-

7

and-talk technique in and of itself. But how it is executed in a specific case warrants strict scrutiny because a fundamental constitutional protection is at stake. "We have held that there is a fundamental right to privacy in our homes implicit in the Arkansas Constitution and that any violation of that fundamental right requires a strict-scrutiny review and compelling state interest." *State v. Brown*, 356 Ark. 460, 472, 156 S.W.3d 722, 730 (2004). In other words, a court's concern reaches a climax when the State seeks to uphold law enforcement's entry into a private home without a warrant issued by a neutral magistrate.

Having applied the applicable standard of review to a defendant's challenge of the denial of a motion to suppress evidence, *Jackson v. State*, 2013 Ark. 201, 427 S.W.3d 607, we conclude that Virgil is correct: the circuit court erred when it denied his motion to suppress evidence. The motion should have been granted.[2]

This case is equal parts disappointment and curiosity given the rule of state constitutional law the Arkansas Supreme Court so well pronounced sixteen years ago in *Brown*—a decision that could not be more on point if it were an angel dancing on the head of a pin. In *Brown*, our supreme court, after a detailed and thoughtful analysis, applied the "*Ferrier* warnings" and reversed the denial of a motion to suppress involving a knock-and-talk by a drug task force. 356 Ark. at 474, 156 S.W.3d at 732. The *Ferrier* warnings refer to a knock-and-talk holding that the Washington Supreme Court issued in 1998 regarding

---

[2]In his motion to suppress, Virgil argued that the Conway Police Department "failed to give the requisite warnings" to Felton "before they illegally gained entry into the house." He contended that the police officers' warrantless entry violated his "Fourth and Fourteenth Amendment rights pursuant to the United States Constitution; the actions also violated Virgil's corresponding rights pursuant to the Arkansas Constitution." While not a model of constitutional argumentation and reasoning, it will do.

the scope of protection that the state's constitution provided its citizens while inside their homes and engaged by law enforcement personnel who lacked a warrant. *See State v. Ferrier*, 960 P.2d 927 (Wash. 1998). In that decision, the Washington Supreme Court held as follows:

> We, therefore, adopt the following rule: that when police officers conduct a knock and talk for the purpose of obtaining consent to search a home, and thereby avoid the necessity of obtaining a warrant, *they must, prior to entering the home, inform the person from whom consent is sought that he or she may lawfully refuse consent to the search* and that they can revoke, at any time, the consent that they give, and can limit the scope of the consent to certain areas of the home. *The failure to provide these warnings prior to entering the home, vitiates any consent thereafter.*

*Brown*, 356 Ark. at 471, 156 S.W.3d at 730 (quoting *Ferrier*, 960 P.2d at 934) (emphasis added).[3] Our supreme court ultimately grounded *Brown*'s holding in the Arkansas Constitution, recognizing that "[t]his state's constitutional history and preexisting state law regarding the privacy rights of a home dweller in his or her home combine to support our decision to discard federal precedent and adopt an interpretation of our state constitution compatible with state law." *Id.* at 470, 156 S.W.3d at 729.

That is all well and good as a matter of constitutional principles one may say. But what of the facts in *Brown*? Can that case be factually distinguished from this one in a meaningful legal sense? No. To the contrary, the unconstitutionally invasive encounter

---

[3]The Washington Supreme Court reaffirmed the *Ferrier* warnings as recently as 2016. *See State v. Budd*, 374 P.3d 137, 140 (Wash. 2016) (en banc). In *Budd*, the court expressly rejected the State's argument that "*Ferrier* should be read as to allow officers to enter the home first, give the warnings, and then begin their search." *Id.* at 141. (That is what the Conway Police Department did in this case.) Instead, the supreme court held that "Budd's consent was invalid because the officers did not give him the *Ferrier* warnings before entering his home." *Id.* at 140.

9

with the officers in *Brown* was less intrusive than the one Felton encountered.  Here are the

material facts in *Brown* as recited by our supreme court:

> The facts are that on August 23, 2002, at about ten o'clock in the morning, three agents of the Fifth Judicial District Drug Task Force (Chris Ridenhour, Johnny Casto, and Shawn Armstrong) approached the residence of appellees Brown and Williams in Russellville.  They did so because of information received from two anonymous sources that Brown and Williams were involved in drug activity and that a small child inside the trailer had become ill due to drug manufacturing.  Upon reaching the door to the trailer home, they smelled a strong and familiar chemical odor.  Agent Ridenhour knocked on the door, and Brown answered.  The agent told her that the three agents had information that someone was possibly growing marijuana there or there was other illegal drug use at the residence and that they wanted to investigate.

> Brown asked the agents to wait a minute.  She closed the door but then returned a short while later.  Agent Ridenhour presented her with a consent-to-search form to sign which read:

> ### CONSENT TO SEARCH

> I give permission to the 5th Judicial District Drug Task Force to search my vehicle/residence (circle one) for contraband or illegal items.

> Person giving consent

> Officer:

> Date and Time

> Jaye Brown and Officer Ridenhour signed the consent form.  Jaye Brown did not circle "vehicle" or "residence."  A search of the residence by the agents ensued.

*Id.* at 463, 156 S.W.3d at 724.

The takeaways are these.  Like the occupant in *Brown*, Felton was in her home when

the police came a-knockin'.  Like the occupant in *Brown*, Felton opened the door.  Unlike

the occupant in *Brown*, who was told the reason for the investigative visit while the police

10

remained outside the home, the Conway Police did not speak their intentions to Felton until they were already (within a few seconds) inside her home. Further, in *Brown*, the police sought the occupant's consent while they were outside the home. Here, the police did not either present a written consent-to-search form or seek verbal consent to search from Felton until they were already inside the apartment. By that time, the officers had started talking about saving time, telling Felton that she did not need to worry about filling in the blanks of the form that was eventually presented to her, stating on the one hand that they could go get a warrant if they wanted after smelling marijuana inside the apartment (which they only did after they were inside), and on the other hand telling her that they had no interest in a user's amount of the drug, and so on.

The supreme court sowed some serious constitutional seed in *Brown*. It then fertilized that seed in *Woolbright v. State*, 357 Ark. 63, 160 S.W.3d 315 (2004). Observe the point at which the supreme court again told the officers that they had to inform a resident of his right to refuse consent—at the point of *entry* into his home, not after they were already inside.

> We have recently addressed the propriety of the "knock–and–talk" procedure under the protections of the Arkansas Constitution. *See State v. Brown,* 356 Ark. 460, 156 S.W.3d 722 (2004). In that case, we held that a home dweller must be advised of his or her right to refuse consent in order to validate a consensual search under the Arkansas Constitution. *Id.* It is undisputed that none of the officers informed Mr. Johnson that he had the right to refuse consent to *the entry* and subsequent search of his home. Accordingly, we must reverse and remand for the suppression of all evidence that flowed from this unconstitutional search.

357 Ark. at 80, 160 S.W.3d at 326 (emphasis added). And in a case that followed *Brown* and *Woolbright*, our supreme court again reversed the denial of a motion to suppress because

the resident was not given the required warning at the right time. *See Carson v. State*, 363 Ark. 158, 211 S.W.3d 527 (2005).

As *Brown* and *Woolbright* and *Carson* went, so too must this case go.

We end our discussion by noting that Arkansas Rule of Criminal Procedure 11.1 reflects the bedrock principle that a warrantless entry into a person's home is presumptively unreasonable:

> (a) An officer may conduct searches and make seizures without a search warrant or other color of authority if consent is given to the search.
>
> (b) The state has the burden of proving by clear and positive evidence that consent to a search was freely and voluntarily given and that there was no actual or implied duress or coercion.
>
> (c) A search of a dwelling based on consent shall not be valid under this rule unless the person giving the consent was advised of the right to refuse consent. For purposes of this subsection, a "dwelling" means a building or other structure where any person lives or which is customarily used for overnight accommodation of persons. Each unit of a structure divided into separately occupied units is itself a dwelling.

Ark. R. Crim. P. 11.1 (2019). (In fact, Rule 11.1 was amended to add subsection (c) post–*Brown*.) A separate rule of criminal procedure, Rule 10.1, explains that the term "search" encompasses

> any intrusion other than an arrest, by an officer . . . upon an individual's person, property, or privacy, for the purpose of seizing individuals or things or obtaining information by inspection or surveillance, if such intrusion, in the absence of legal authority or sufficient consent, would be a civil wrong, criminal offense, or violation of the individuals' rights under the Constitution of the United States or this state.

Ark. R. Crim. P. 10.1 (2019). "[A]ny intrusion . . . upon an individual's person, property, or privacy" means just what it says.

12

Given the Arkansas Constitution as interpreted by the Arkansas Supreme Court, and the rules of criminal procedure, we have no hesitation in holding that law enforcement's entry into Felton's apartment for the purpose of investigating possible criminal activity was an "intrusion" and therefore a "search" under Arkansas law. Because the search (that is, the entry into the apartment) was initiated without a warrant, it was unconstitutional unless justified by an exception to the warrant requirement. *Id.* No exception has been raised in this case other than that Felton consented. But as we have shown, the officers did not procure her consent to search the home before the search began; nor did they tell Felton that she could deny them entry before they entered. These oversights turned a potentially protected knock-and-talk into an impermissible knock-and-enter.

"[T]he legal principle that a person's home is a zone of privacy is as sacrosanct as any right or principle under our state constitution and case law." *Brown*, 356 Ark. at 469, 156 S.W.3d at 729 (internal citations omitted). That is why not even Felton's belated permission to search can scrub the constitutional taint.

The State has failed to carry its heavy burden to justify the police conduct in this case. The circuit court's denial of Virgil's motion to suppress evidence is therefore reversed, and all items seized during the unconstitutional search must be suppressed.

### III. *The Stipulation, the Suppression Hearing, and the Jury Trial*

We return to the stipulation the State and Virgil presented during the suppression hearing and consider whether it could be used against him during a jury trial on the charge that he failed to comply with sex-offender registration-and-reporting requirements. As previously mentioned, on 28 February 2019, Virgil agreed that he resided at 1619 Westlake

13

Drive, No. 1907, Conway, Arkansas, on 4 January 2018. This gave him standing to challenge the search. *See Littlepage v. State*, 314 Ark. 361, 368, 863 S.W.2d 276, 280 (1993) ("[W]hether an appellant has standing depends upon whether he manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as reasonable."). During the jury trial that was held one week after the suppression hearing ended, the State sought to introduce the pretrial stipulation during its case-in-chief. Virgil's lawyer objected in the following manner:

> Judge, if you'll read the transcript, I specifically say in the context of the Fourth Amendment Hearing, which was the thing before the Court at the time, and in that context and for the purpose of this hearing is what I believe the transcript says as it related to the Fourth Amendment Issue.

> If the Court will look at <u>Sims v. State</u> which is an Arkansas Case and the US Supreme Court Case <u>Simmons v. US</u>, clearly states that—in this instance Mr. Virgil doesn't have to give up his Fifth Amendment Right not to testify or to testify and pitted against his Fourth Amendment Right to challenge the search and that's what we did in this case and at least for that limited purpose as it—as born[e] out by the transcript itself.

The prosecuting attorney argued in response that Arkansas Rule of Criminal Procedure 20.3 allowed the stipulation to be admitted against Virgil at trial. Virgil's attorney further argued that the transcript showed that Virgil "was staying at the residence in the context of this hearing based on the Fourth Amendment." Virgil's counsel told the court that the stipulation was made for a limited purpose, which did not include permitting its use against Virgil during the jury trial on a criminal charge. The circuit court overruled Virgil's objection, stating that the stipulation did not pit "his Fourth versus his Fifth Amendment Rights under the circumstances." As a result, the jury learned that Virgil resided at 1618

14

Westlake Dr., No. 1907, on 4 January 2018. The stipulation was the final piece of evidence the State presented to the jury before it rested.

The issue here is whether the circuit court committed an error of constitutional magnitude when it admitted Virgil's pretrial residency stipulation at trial over his objection. Generally, a defendant's voluntary testimony or admission in a preliminary examination may be received as evidence against the defendant during his trial as his own admission. *E.g.*, *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003) (voluntary statement to police received as an admission of guilt). In *Simmons v. United States*, 390 U.S. 377 (1968), however, the Supreme Court of the United States recognized an exception to the general rule, which was based on the Fifth Amendment's privilege against self-incrimination.

In *Simmons*, one defendant moved before trial to suppress evidence (a suitcase containing incriminating evidence related to an armed robbery). *Id*. at 381. To establish standing to challenge a search, defendant Garrett testified during the suppression hearing that he owned the suitcase. At trial, the State used the inculpatory testimony from the suppression hearing against Garrett. *Id*. Garrett was convicted of committing armed robbery. The Supreme Court reversed Garrett's robbery conviction. It reasoned that a defendant like Garrett cannot be forced to forfeit his Fifth Amendment right to avoid self-incrimination while also pursuing the Fourth Amendment right to be free from an illegal search and seizure. *Id*. at 394. The Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." *Id*. The "undeniable tension" between the Fourth and Fifth Amendments in that case led

15

the Court to write that it was "intolerable that one constitutional right should have to be surrendered in order to assert another." *Id.*

Virgil contends that his "stipulation was tantamount to the testimony discussed in *Simmons*." The State disagrees, arguing that the "[u]se of that simple stipulation at trial is not akin to the use of testimony given 'in support of a motion to suppress evidence'—which is what is prohibited under *Simmons*."

We agree with Virgil that his suppression-related stipulation is the functional equivalent of the pretrial inculpatory testimony that was received as evidence in *Simmons*. Like the defendant in *Simmons*, Virgil wanted the benefit of his pretrial stipulation regarding his residency so he could assert that an unlawful search-and-seizure had occurred. The stipulation gave Virgil standing under the Fourth Amendment. And the stipulation was obviously in tension with his Fifth Amendment right to avoid self-incrimination. Although *Simmons* addressed a defendant's voluntary testimony, the distinction between receiving inculpatory oral testimony during a suppression hearing and receiving an inculpatory stipulation during a suppression hearing is of no constitutional difference.

Virgil faced the same essential dilemma that defendant Garrett did in *Simmons*. By agreeing that he had a protected privacy interest and lived at a specific address, that fact, if established, would have put Virgil in jeopardy of being convicted of a criminal offense. That "one constitutional right should have to be surrendered in order to assert another" is the issue here, just as it was in *Simmons*. We therefore hold that the circuit court's admission of the pretrial stipulation against Virgil during the prosecutor's case-in-chief was an error.

16

There is more. The State argues that, "[a]ssuming admission of the stipulation was error, admission was harmless . . . beyond a reasonable doubt." We agree that a harmless-error analysis applies, which means we must decide whether the State has shown that the court's error was harmless beyond a reasonable doubt. *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991).

It was not. Without the stipulation that Virgil lived at the Westlake apartment, the case was a dogfall. The testimony at trial was that Virgil had signed an acknowledgment form on 2 January 2018 (two days before the search) identifying his address as 1025 Rio Grande in Conway. No officer had visited that home or knew if he was staying at the Rio Grande address. No officer could say he was not living at Rio Grande. Letters addressed to Virgil recovered from the Westlake apartment identified his address as 1025 Rio Grande.

Dejah Felton's mother, Tracy, said that her daughter and Virgil moved into the Westlake apartment in 2017. She agreed that Felton and Virgil were living together at the Westlake apartment on 4 January 2018. After Felton and Virgil were arrested, Tracy helped move items to storage and moved some of Virgil's things to his father's house on Rio Grande.

Virgil's father, Rufus L. Virgil, Sr., testified that he lived on 1025 Rio Grande Road in Conway and that his son lived with him at all relevant points in time, including January 2018. He said that Virgil had never resided at the Westlake apartment and knew nothing about any stipulation. Gloria Virgil, the defendant's mother, said that her son lived with his father at 1025 Rio Grande in January 2018; he did not live at the Westlake apartment.

17

The State's theory of the case was that Virgil had a legal duty to report a change of address as a sex offender and that he failed to report that he was living in the Westlake apartment; alternatively, he falsely reported that he was living at the Rio Grande address. Admitting Virgil's residency stipulation as evidence was not harmless beyond a reasonable doubt. *Sans* stipulation, the State's case came down to a "she said, they said" between Felton's mother and Virgil's parents on where Virgil lived in January 2018. In other words, the evidence of guilt was not overwhelming absent the stipulation. No documents contradicted Virgil's identification of his father's Rio Grande address as his home. And the mail recovered from the Westlake apartment was addressed to the Rio Grande address. All things considered, there was a reasonable probability that the evidentiary error in this case contributed to the jury's decision to convict Virgil.

IV. *Conclusion*

The Conway Police Department searched Virgil's residence without a warrant and before receiving the consent to do so in a timely manner. Therefore, the circuit court's denial of his motion to suppress is reversed, and all items procured during the unlawful search must be suppressed. During the criminal trial, over Virgil's objections, the prosecuting attorney used Virgil's pretrial stipulation against him in the State's case-in-chief. That act violated the prophylactic constitutional rule the Supreme Court of the United States applied more than fifty years ago. Because the error at trial was not a harmless one, we must vacate Virgil's conviction and remand for proceedings consistent with this opinion.

Reversed and remanded.

VIRDEN and VAUGHT, JJ., agree.

18

*Hancock Law Firm*, by: *Sharon Kiel*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Pamela Rumpz*, Sr. Ass't Att'y Gen., for appellee.