Cite as 2021 Ark. App. 79

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CR-19-959

|  |  |
|---|---|
| | **Opinion Delivered** February 24, 2021 |
| KENNETH M. ABERNATHY<br>APPELLANT | APPEAL FROM THE SALINE<br>COUNTY CIRCUIT COURT<br>[NO. 63CR-18-1100] |
| V. | |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE GRISHAM PHILLIPS,<br>JUDGE |
| | REVERSED AND REMANDED |

## BRANDON J. HARRISON, Chief Judge

Kenneth Abernathy was convicted of two felony drug charges and now appeals the Saline County Circuit Court's denial of his motion to suppress a warrantless search of his home. He argues that the police officer's warrantless entry into his home occurred without consent and that any contraband obtained after the illegal entry should have been suppressed. We agree that the officer entered Abernathy's home without legal justification and that any evidence obtained as a result of the officer's entry should have been suppressed. Because there is no evidence to support Abernathy's conviction, we reverse and remand.

In December 2018, the State charged Abernathy with possession of drug paraphernalia to inhale methamphetamine and possession of a controlled substance (methamphetamine) after law enforcement seized certain contraband from Abernathy's home upon a warrantless entry. The circuit court convened a bench trial on 9 August 2019; but prior to presenting evidence, the parties stipulated that the crime-lab report would be

introduced without objection. The lab report stated that "the clear bulb in glass smoking device containing white residue was methamphetamine," that the net weight of the methamphetamine was 0.2905 grams, and that the paraphernalia and the methamphetamine had been found in Abernathy's house. The circuit court also noted that a motion to suppress would be ruled on as part of the evidence in the trial.

When the trial commenced, Danny Rucker, an officer with the Saline County Sheriff's Department, testified that on 13 October 2018, he responded to a report of property damage on White Estates Road. The report stated that a red Grand Am had been driving suspiciously back and forth and had hit a mailbox before leaving the scene. A description of the vehicle was transmitted to other local officers, and a Bryant police officer reported that he had just stopped a similar vehicle and that the driver was Kenneth Abernathy. Rucker was familiar with Abernathy, his vehicle, and where he lived. Rucker also knew that Robert Johnson, who used a wheelchair, lived with Abernathy.

Rucker explained that he went to Abernathy's home, which was a trailer, and saw the red Grand Am in the driveway. Rucker noticed damage to the front of the vehicle that fit the description of the mailbox incident. It was raining heavily when the officer went to the front porch, which had no roof, and knocked on the door. Johnson opened the door. Rucker "stepped into the threshold of the door" and asked to speak with Abernathy. Johnson yelled for Abernathy, who was not in the room. Abernathy yelled, "What?" and Rucker yelled that it was the sheriff's department and he needed to speak to him (Abernathy). As he stood at the threshold to get out of the rain, Rucker noticed a strong

odor of methamphetamine being burned.

Abernathy then pulled back a blanket that had been used as a door between the living area and a bedroom; when the blanket was pulled back, Rucker saw Abernathy and a female sitting on his bed with a meth pipe. Abernathy came into the living area, and Rucker asked Abernathy if he was smoking meth but also said he (Rucker) was there to talk about the mailbox incident. Abernathy admitted hitting the mailbox, and when asked a second time if he was smoking meth, he said yes. Abernathy was "very angry" with Johnson for opening the door. Rucker detained Abernathy and sat him on the couch; he then went into the bedroom to retrieve the pipe and to make sure the woman was not armed. He brought the woman into the living area and began to detain her as well; at that point, Abernathy said, "[I]t's mine. It's all mine." Abernathy was arrested and charged.

On cross-examination, Rucker agreed that he had stepped inside the door "for convenience" because it was raining and that he had not smelled any kind of controlled substance before he stepped inside. He also agreed that the main door to the trailer opened inward, which was important because Johnson, who was in a wheelchair, had to roll backward inside the home to open that door. Officer Rucker did not recall a storm door that he had to open before he stepped onto the threshold. He said:

> I actually didn't step into the door, ma'am, I stepped onto the threshold which is a plate about the width of this here. I had my raincoat on and a rain hat and I was soaked with water and it was dripping. I tried not to enter into the—so that rain would get in his floor as I would do in my own house.

He agreed that he was "balancing" on the threshold of the door. Upon questioning by the court, Rucker explained that Abernathy had said angrily to Johnson, "Why the hell did you

3

open the dam [sic] door . . . now I'm going to friggin' jail . . . because you opened the door and let him in."

Robert Johnson testified that he had resided with Abernathy from June to October 2018. He said that he paid rent and had his own bedroom. Johnson said the door to the trailer consisted of a regular door that opened into the living area and a storm door that opened toward the outside. Johnson stated that he had seen a vehicle approach the house and had spoken to Rucker from the doorway while Rucker was still in the yard. Johnson explained, "[I]t was raining real bad and I had sorta—it takes me a minute to back up and by the time I had backed up to holler at Kenneth he was up on the porch and in the door." Johnson estimated that Rucker was "probably just a foot" inside the door and that the storm door had already been open. According to Johnson, when Abernathy entered the living area, he asked Rucker to "step back outside," but Rucker did not leave. Johnson denied ever inviting Rucker into the home or giving him any indication that he could come inside the home. But he also agreed that Abernathy had been "screaming and hollering" at him because he had let Rucker inside. The following exchange then took place between the court and Johnson:

THE COURT: Can you tell me, as best you can remember, what Mr. Abernathy was saying to you about—why he was mad at you and why he was yelling at you? Just can you remember what he was saying?

THE WITNESS: He was telling me not to let no police or officers in his house, this and that, and I just—I can't tell what's outside until I open the door. I'm sorry. I'm too short.

THE COURT: So, and again, it's somewhat important I think, you're

4

saying that he was mad at you for letting the officer in?

THE WITNESS: Yeah.

Defense counsel argued that the circuit court should suppress the "fruit" of the search because the officer stepped inside the home without being invited in. In denying the motion, the circuit court explained,

> One reason I was curious about what Mr.—what the officer said and Mr. Abernathy was saying to Mr. Johnson and what Mr. Johnson said was the what appears to be an impression of Mr. Abernathy that Mr. Johnson let the officer in. That's the reason I wanted specific words. I'll be frank with you. Initially the officer said he was mad because Mr. Johnson opened the door. And when I think Ms. Bush in somewhat of a leading question, and I'm not fussing at you, said, was he mad at you for letting the officer in, and the answer was yes. So that's the reason I was concerned about the specific language that Mr. Abernathy employed and Mr. Johnson pretty much cleared that up and I was careful not to lead him. I was careful to ask him what was said and he said that Mr. Abernathy was upset because Mr. Johnson let the officer in. So I think considering all the facts and the circumstances this was a—the officer was there as a result of being asked into the house.
>
> . . . .
>
> I do think the rain is important. I think that when the door's opened I think the officer would also assume that he was being asked in because of the rain outside, in addition to Mr. Abernathy being mad because Mr. Johnson let the officer in. . . . [I]t was a very minimal invasion based upon the circumstances, the weather that was occurring at the time.

The circuit court found Abernathy guilty and sentenced him to three years' imprisonment on each charge, to run concurrently. Abernathy has now appealed the denial of his motion to suppress.

Abernathy argues that Officer Rucker's warrantless search was in violation of his constitutional rights under both the United States Constitution and the constitution of the

5

State of Arkansas.  The State responds that Officer Rucker's warrantless search was authorized by the implied consent of Johnson.  Our standard of review for a circuit court's action granting or denying motions to suppress evidence obtained by a warrantless search requires that we make an independent determination based on the totality of the circumstances.  *Anderson v. State*, 2018 Ark. App. 92, 538 S.W.3d 279.  The illegal entry by law enforcement officers into the homes of citizens is the "chief evil" the Fourth Amendment to the United States Constitution is intended to protect against and therefore is of the highest degree of seriousness.  *Payton v. New York*, 445 U.S. 573 (1980).  The same protection issues from the Arkansas Constitution.  *See Virgil v. State*, 2020 Ark. App. 314, 603 S.W.3d 603.  A warrantless entry into a private residence is presumptively unreasonable under the Fourth Amendment and the corresponding article in our state constitution.  *Latta v. State*, 350 Ark. 488, 88 S.W.3d 833 (2002); *Virgil*, *supra*.  But that presumption may be overcome if law enforcement obtained the proper and timely consent to conduct a warrantless search.  *See Stone v. State*, 348 Ark. 661, 74 S.W.3d 591 (2002).  Consent to search the premises can be given only by a person who, by ownership or otherwise, is apparently entitled to give or withhold it.  Ark. R. Crim. P. 11.2(c) (2020).  Whether consent to enter a home was given must be determined on a case-by-case basis and is judged using an objective standard.  *See Hillard v. State*, 321 Ark. 39, 900 S.W.2d 167 (1995).  The test is whether the facts available to the police officer when the entry occurred would give a person of reasonable caution reason to believe that a "consenting party" had authority over the premises and in fact gave consent.  *Id.*

6

Although Abernathy's argument flails into unnecessary areas given the circuit court proceedings, we focus on consent. The circuit court found that when Johnson opened the door, Rucker reasonably assumed he was being invited into the home, and the court characterized Rucker's action as a "minimal invasion." Our supreme court has held that consent to an invasion of privacy must be proved by clear and positive testimony. *Holmes v. State*, 347 Ark. 530, 65 S.W.3d 860 (2002). Regarding the concept of implied consent, our supreme court has held that "whatever relevance the implied consent doctrine may have in other contexts, it is inappropriate to 'sanction entry into the home based upon inferred consent.'" *Norris v. State*, 338 Ark. 397, 409, 993 S.W.2d 918, 925 (1999) (quoting *United States v. Gonzalez*, 71 F.3d 819, 830 (11th Cir. 1996)).

Having applied the proper standard of review to a suppression challenge, *Davis v. State*, 351 Ark. 406, 94 S.W.3d 892 (2003), we conclude that the State failed to meet its burden of proving by clear and positive testimony that Johnson "consented" to Rucker's entry as the State contends. In his testimony, Johnson denied ever inviting Rucker into the home or giving him any indication that he could come inside the home. And to his credit, Officer Rucker did not claim that he was invited into the home. In fact, he admitted that he stepped into the threshold "for convenience" and to get out of the pouring rain. But there is no weather exception to the federal and state constitutional protections against a warrantless entry into a home by law enforcement. Therefore, based on the totality of the circumstances, we hold that the circuit court erred in denying Abernathy's motion to suppress and that evidence obtained by police during the subsequent illegal entry should

7

have been suppressed as fruit of the poisonous tree. And because there is no other evidence supporting Abernathy's conviction, we reverse the conviction and remand for an order consistent with this opinion.

Reversed and remanded.

WHITEAKER and MURPHY, JJ., agree.

*Jones Law Firm*, by: *F. Parker Jones III*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Jacob H. Jones*, Ass't Att'y Gen., for appellee.