Mark LATTA *v.* STATE of Arkansas

CR 01-679                                        88 S.W.3d 833

Supreme Court of Arkansas
Opinion delivered November 7, 2002

[Petition for rehearing denied December 12, 2002.]

*McCullough Law Firm*, by: *R.S. McCullough*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Lauren Elizabeth Heil*, Ass't Att'y Gen., and *David J. Davies*, Ass't Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant Mark Latta appeals the order of the Garland County Circuit Court convicting him of manufacturing a controlled substance, methamphetamine, a Class Y felony, in violation of Ark. Code Ann. § 5-64-401 (Supp. 2001). He was sentenced to a term of life imprisonment; thus, this court's jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2). Appellant raises five arguments on appeal. Because we agree with Appellant that the trial court erred in denying Appellant's motion to suppress, we reverse the conviction and remand for further proceedings. It is therefore unnecessary for us to address the other points raised by Appellant on appeal.

According to the record before us, four investigators from the Eighteenth East Drug Task Force went to Appellant's home on

February 8, 1999, after receiving an anonymous tip that Appellant was maintaining a methamphetamine lab on the premises. The investigators were Todd Sanders, Richard Norris, Cory DeArmon, and Brian Keck. While some of the facts regarding what happened that day are in dispute, it is undisputed that when the officers arrived at Appellant's residence, they knocked on the front door, and it was opened by a black male, later identified to be Melvin Arnold. It is also undisputed that these same officers had been to this residence before in October 1998 and were acquainted with Appellant and knew him to be the owner of the home. The officers, who had identified themselves, asked if Appellant was at home. Arnold responded that he was in the bedroom. What happened next is not entirely clear; suffice to say, that three of the investigators entered the Appellant's living room and called out for Appellant to come out and talk with them.

According to Sanders, the bedroom door was partially open and the officers noticed some movement in the bedroom. The officers then drew their weapons and pointed them at the bedroom door; thus, when Appellant exited the bedroom, there were three guns pointed at him. One of the officers conducted a pat-down search of Appellant's person to check for weapons. Finding none, the three officers put their own weapons away. Sanders then asked Appellant to step outside and talk to him. Appellant, who was barefoot at the time, complied. Norris and DeArmon remained inside the residence, along with three other people who were at Appellant's home at that time.

Once outside, Sanders told Appellant that they had received an anonymous tip that he was cooking methamphetamine again. Appellant denied any such activity and demanded to know who had contacted the officers. Sanders explained that he did not know the identity of the caller and again asked if Appellant was making methamphetamine. Appellant again denied the accusation. Thereafter, Sanders asked if Appellant had any methamphetamine for personal use. Once again, there was a conflict as to how the subsequent events unfolded. According to Sanders, Appellant initially denied having any methamphetamine for personal use, but when confronted about it again, finally admitted that he had some

in a brown pill bottle in his bedroom. Sanders then stated that Appellant led him to his bedroom and turned over the pill bottle. Sanders asked if Appellant had anything else, and Appellant handed him a pie plate with methamphetamine residue on it. According to Sanders, this question and answer session went on two or three more times, until Appellant finally said there was nothing else. Then, Sanders asked if the officers could look around the house, and Appellant agreed.

Appellant was arrested and initially charged with possession of methamphetamine with intent to deliver. The information was later amended to include a manufacturing charge. After his arrest, Appellant denied that he ever admitted to Sanders that he was in possession of drugs or that he handed over the brown pill bottle or pie plates. Appellant contended that Sanders kept him outside while DeArmon and Norris searched his house. Further, Appellant stated that he never gave consent for the search. Appellant filed several pretrial motions, including two motions to suppress. The first motion, filed by Appellant's first attorney, on May 12, 1999, alleged that the search was invalid because it was made without a warrant and was based on Appellant's alleged consent, which was not voluntarily given.

A *Denno* hearing was held on April 26, 1999. At this hearing, Sanders simply stated that they knocked on Appellant's door, it was opened by a black male, and the officers stepped inside. They then asked where Appellant was, and the black male told them that he was in the bedroom. On cross-examination, Sanders stated that the black male let them in by simply opening the door. When asked what the other officers were doing while he was outside, Sanders said he did not know if they were conducting any type of search. Sanders admitted that he never read Appellant his *Miranda* rights before taking him outside, because he was not in custody. According to Sanders, after repeated questioning, Appellant finally admitted to having some methamphetamine for personal use. Sanders stated that Appellant then voluntarily retrieved the bottle from his bedroom, as well as the pie plates he gave to him. Sanders also admitted that he did not obtain written consent

to search and that the officers lacked probable cause to get a search warrant.

Investigator Richard Norris testified at the *Denno* hearing that they entered the residence after Arnold opened the door. Norris admitted that Arnold gave no indication to the officers that they could enter the house. In fact, Norris stated, "I don't think he could have invited us in, it not being his house." Norris also testified that he initially went outside with Sanders and Appellant, but spent most of his time inside the house. He did not hear Appellant give Sanders consent to search the house, but did hear Appellant admit that he had a pill bottle.

Investigator Cory DeArmon testified that when Arnold opened the door he told the officers to "come in." He denied searching the house while Sanders talked with Appellant. DeArmon also did not hear Appellant consent to the search; rather, he was told by Sanders that they could search the house. DeArmon did testify that he saw Appellant lead Sanders to the bedroom and hand over other evidence.

The final witness to testify was Investigator Brian Keck. He stated that he remained outside the house to contain the area. At no point did Keck enter Appellant's residence. The trial court subsequently entered a written order on May 5, 1999, finding that the statements Appellant made to officers on February 8 were admissible because he was not in custody at that time and could have told the officers to leave at any time.

A second motion to suppress was filed by Appellant's current counsel on December 27, 1999, alleging generally that suppression was warranted, because Appellant's Fourth Amendment rights had been violated. A hearing on this second motion to suppress was held on April 20, 2000. At this hearing, Sanders again testified, but some of his testimony differed slightly from what he testified to at the *Denno* hearing. This time, Sanders stated that after Arnold opened the door, he asked if Appellant was there, whereupon Arnold said he was and "basically just stepped out of the way[.]" Sanders stated that the officers went inside the home about three feet past the doorway. Sanders also testified that

after Appellant admitted to having some methamphetamine for personal use, he responded, "Well, you know, we're here, you know. Let's just go ahead and get this taken care of today. You want to give it to me?" Sanders did admit that Appellant had previously ordered police off his property. The State presented no other evidence during the suppression hearing.

Appellant then testified on his own behalf. He stated that he had previously come into contact with these officers in October 1998 when he ordered them off his property, unless they obtained a search warrant. Appellant stated there were "No Trespassing" signs posted on his property both in October and in February. According to Appellant, while he was outside with Sanders, Norris went back into the house, and the officers came outside and notified him that they had found some evidence after conducting a search. Appellant stated that he was then taken back into the house. He denied ever voluntarily turning over any evidence, or ever admitting to Sanders that he was in possession of any methamphetamine.

Arnold also testified for the defense at this hearing. He explained that he had come to Appellant's house that day looking for someone to give him a ride to work. He stated that he never gave police consent to enter Appellant's home on February 8. According to Arnold, when asked by the officers where Appellant was, he simply told them that Appellant was busy. Thereafter, the officers simply opened the door and entered the home. Arnold testified that he recalled Sanders taking Appellant outside to talk to him. He heard Sanders ask Appellant who was in the bedroom, but heard no other part of the conversation.

At the close of the suppression hearing, the trial court requested that the parties submit simultaneous briefs on the suppression issue within ten days of the hearing. The trial court subsequently entered an order on April 26, 2000, denying Appellant's motion to suppress. In so ruling, the trial court made the following findings:

> 1. Officers went to Defendant's residence to interview the Defendant about reports of drug activity.

2. The Defendant's door was answered by a guest. When asked if the Defendant was present the guest stepped back to clear the doorway and called for the Defendant.

3. The officers observed activity in the bedroom, became alarmed for their safety and drew their weapons.

4. The Defendant was confronted, it was ascertained that he did not pose a threat to the officers and Investigator Sanders and Defendant stepped outside.

5. A discussion ensued during which Defendant acknowledged that he was in possession of controlled substances.

6. Defendant then took the officers back into his residence and revealed the location of the controlled substances.

I find no grounds for the suppression of this evidence and it will be admissible at the trial of this case.

A jury trial was held on June 13, 2000. Sanders again testified about the events of February 8. He stated that a black male opened the door at Appellant's residence and when they asked for Appellant, the man said, "Yeah, he's in the bedroom," and stepped back away from the door. When asked if the male invited the officers into the house, Sanders stated that he never verbally asked the officers to come in.

Richard Norris also testified that he went to Appellant's residence both in October 1998 and in February 1999. According to Norris, he heard Appellant admit that he had a pill bottle containing methamphetamine in his bedroom. On cross, he stated that Appellant gave Sanders the pill bottle and then Sanders turned it over to him. Norris also testified about the components of manufacturing methamphetamine and how they are used to make the drug.

The defense rested without presenting any evidence. The jury returned a guilty verdict, and Appellant was sentenced as previously stated. This appeal followed.

For his first point on appeal, Appellant argues that it was error for the trial court to deny his motion to suppress. In support of this argument, Appellant contends that the officers had no probable cause or reasonable suspicion to justify their going to Appellant's residence and certainly had no right to enter his home;

thus, the subsequently seized evidence became "fruit of the poisonous tree."[1] The State counters that the trial court's order denying Appellant's motion was not clearly against the preponderance of the evidence. First, the State avers that the officers did not need probable cause to go to Appellant's home for the purpose of talking to him about the suspected drug activity. The State acknowledges, however, that the testimony in this case may not rise to the level of clear and convincing evidence that the officers entered Appellant's home with valid consent.

■ ■ When reviewing a trial court's decision on a motion to suppress, this court makes an independent determination based on the totality of the circumstances and views the evidence in a light most favorable to the State. *Griffin v. State*, 347 Ark. 788, 67 S.W.3d 582 (2002); *Burris v. State*, 330 Ark. 66, 954 S.W.2d 209 (1997). We will reverse only if the trial court's decision was clearly against the preponderance of the evidence. *Id.*; *Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997). Moreover, we defer to the trial court in assessing witness credibility. *Griffin*, 347 Ark. 788, 67 S.W.3d 582; *Laime v. State*, 347 Ark. 142, 60 S.W.3d 464 (2001), *cert. denied*, 122 S. Ct. 1914 (2002); *Rankin v. State*, 338 Ark. 723, 1 S.W.3d 14 (1999).

■ ■ Initially, we review Appellant's allegation that police did not lawfully go to his home because they lacked probable cause or reasonable suspicion to do so. We agree with the State that the officers' actions in going to Appellant's home in an attempt to talk with him did not result in any constitutional violation. This "knock and talk" procedure has recently been analyzed by this court in several opinions. We recognized in *Scott v. State*, 347 Ark. 767, 67 S.W.3d 567 (2002), that the issue of whether the knock and talk procedure was *per se* violative of the Fourth Amendment was an issue of first impression in this State. After looking to other jurisdictions for guidance on the matter, we concluded that the police's action of going to the appellant's home in

---

[1] Appellant's argument on this point is limited to asserting a violation under the Fourth Amendment to the U.S. Constitution. He makes no argument under Article 2, Section 15, of the Arkansas Constitution.

order to request his assistance in a criminal investigation did not amount to a "seizure" under the Fourth Amendment. In reaching this conclusion, we reasoned:

> A seizure does not occur simply because a police officer approaches an individual and asks a few questions. *Id.* A seizure occurs when a reasonable person would not feel "free to leave." *Michigan v Chesternut*, 486 U.S. 567 (1988). The "free to leave" analysis, however, is not an accurate measure of the coercive effect of an encounter in situations where a person would have no desire to leave, such as where the person is seated on a bus. *Florida v. Bostick*, 501 U.S. 429. "In such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 436. The crucial test is whether, taking into account all circumstances, the police conduct would have communicated to a reasonable person "that he was not at liberty to ignore the police presence and go about his business." *Id.* at 437 (citing *Michigan v Chesternut*, 486 U.S. at 569). It is important to note that the "reasonable person" test presupposes an innocent person. *Id.* at 438.

*Id.* at 777-78, 67 S.W.3d at 574. Applying this analysis to the facts in *Scott*, we held that the police did not need a reasonable suspicion in order to approach the appellant's residence in order to ask him questions related to their investigation.

■ We further recognized in *Griffin*, that in most situations where consent is freely and voluntarily given, the knock-and-talk procedure has been upheld as a consensual encounter and a valid means to request consent to search a house. *Id.*, 347 Ark. 788, 67 S.W.3d 582 (citing *United States v. Cormier*, 220 F.3d 1103, 1110-09 (9th Cir. 2000); *United States v. Taylor*, 90 F.3d 903, 909 (4th Cir. 1996); *United States v. Kim*, 27 F.3d 947, 951 (3d Cir. 1994); *United States v. Tobin*, 923 F.2d 1506, 1511-12 (11th Cir. 1991); *United States v. Cruz*, 838 F. Supp. 535, 543 (C.D. Utah 1993); *State v. Green*, 598 So.2d 624, 626 (La. Ct. App. 1992); *State v. Land*, 106 Or. App. 131, 806 P.2d 1156, 1157-59 (1991)).

■ Even prior to these cases analyzing the "knock and talk" procedure, however, this court recognized that an officer

could permissibly approach any person to request that they furnish information or otherwise cooperate in the investigation or prevention of a crime. *See* Ark. R. Crim. P. 2.2(a); *Scott*, 347 Ark. 767, 67 S.W.3d 567. More specifically, this court recognized that entry onto private property by police may be justified by the legitimate police objective of determining if anyone is present to interview as part of an investigation of drug-related activity. *See Miller v. State*, 342 Ark. 213, 27 S.W.3d 427 (2000).

Here, police had received anonymous tips that Appellant was manufacturing methamphetamine. Only a few months before, police investigated Appellant on the same allegations and a subsequent search warrant revealed that Appellant was indeed manufacturing methamphetamine. Sanders admitted that they went to Appellant's home in order to investigate the allegations against him. According to Sanders, Appellant did not ask the officers to leave and in fact was cordial the entire time. Both Sanders and Norris testified that Appellant admitted to possessing methamphetamine for personal use and that it was hidden in a brown pill bottle in his bedroom. Although Appellant denied admitting such, we defer to the trial court's superior position in assessing the credibility of witnesses. Taking into account the circumstances surrounding this encounter and viewing the evidence in a light most favorable to the State, we are not convinced that a reasonable person in Appellant's position would believe that he was not free to "ignore the police presence and go about his business." *Scott*, 347 Ark. at 777, 67 S.W.3d at 574 (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). This is particularly true in light of the fact that Appellant had previous dealings with these same officers on a prior unrelated drug offense and ordered them off his property until they obtained a search warrant.

Having determined that the police were allowed to go to Appellant's residence, we must now determine whether the officers' actions of entering Appellant's residence constituted a Fourth Amendment violation. Appellant argues that the entry was not permissible because the officers were not invited in, and even if they were invited in, the person who opened the door was

not a resident of the home and thus could not consent to their entry.

The State counters that Arnold possessed apparent authority to consent to the officers' entry. The State acknowledges, however, that under *Holmes v. State*, 347 Ark. 530, 65 S.W.3d 860 (2002), the evidence in this matter may not constitute clear and convincing evidence that the police had consent to enter, because there is a lack of clear words inviting the officers into the home. The State, however, avers that this court should reconsider its holding in *Holmes*, as the Eleventh Circuit case, *United States v. Gonzalez*, 71 F.3d 819 (11th Cir. 1996), relied on by this court, has since been distinguished. We disagree.

█ █ It is well settled that a warrantless entry into a private residence is presumptively unreasonable under the Fourth Amendment. *Welsh v. Wisconsin*, 466 U.S. 740 (1984); *Stone v. State*, 348 Ark. 661, 74 S.W.3d 591 (2002); *Holmes*, 347 Ark. 530, 65 S.W.3d 860; *McFerrin v. State*, 344 Ark. 671, 42 S.W.3d 529 (2001). The presumption of unreasonableness may be overcome if the officer obtained consent to conduct a warrantless search. Ark. R. Crim. P. 11.1. It is true that consent may only be given "by a person who, by ownership or otherwise, is apparently entitled to give or withhold consent." Ark. R. Crim. P. 11.2(c). The State bears the burden of proving that the warrantless activity was reasonable. *Holmes*, 347 Ark. 530, 65 S.W.3d 860; *Wofford*, 330 Ark. 8, 952 S.W.2d 646. In order to sustain this burden, the State may not show a mere acquiescence to police authority; but rather, it must present clear and positive testimony that consent was given. *Stone*, 348 Ark. 661, 74 S.W.3d 591; *Holmes*, 347 Ark. 530, 65 S.W.3d 860.

In *Holmes*, police were responding to a domestic-disturbance call involving a man, David Ellis, who happened to be at the appellant's residence. Upon arriving at the appellant's residence, police encountered Ellis and the appellant outside the house. The two men were taken to a squad car for questioning. One of the officers then noticed a woman, Rosa Beth Allen, standing in the doorway of the home and decided to question her about Ellis.

The officer asked the woman if there was anywhere they could talk and the woman responded by opening the door and stepping back. The officer then entered the house and immediately smelled the odor of recently burned marijuana. The officer subsequently advised the appellant of his *Miranda* rights and obtained a written consent to search the home. The search uncovered various drugs and paraphernalia. The appellant moved to suppress the evidence, but his motion was denied.

On appeal, the appellant argued that the police had no justification for entering his home, nor had consent been given by Allen for the entry. This court agreed. In discussing whether Allen's action of opening the door and stepping back amounted to consent, this court relied, in part, on its decision in *Norris v. State*, 338 Ark. 397, 993 S.W.2d 918 (1999). There, this court looked to *United States v. Gonzalez*, 71 F.3d 819, and wrote as follows:

> The question of "implied consent" . . . was more closely examined recently in *U.S. v. Gonzalez, supra*. In *Gonzalez*, the officer approached an individual outside her home and asked if she would consent to a search of her home. Following a conversation with her daughter, she told the officer she wanted to go inside and get a drink of water. The officer then told her he "wanted to go in" with her, and when she did not bar him from going in, he followed her inside. The Eleventh Circuit held that there was no consent to enter:
>
>> We have previously noted our hesitancy to find implied consent (i.e. consent by silence) in the Fourth Amendment context, and we agree with our colleagues in the Ninth Circuit that *whatever relevance the implied consent doctrine may have in other contexts, it is inappropriate to 'sanction entry into the home based upon inferred consent.'* [Emphasis added.]
>
> Gonzalez then quoted from *U.S. v. Shaibu*, 920 F.2d 1423 (9th Cir. 1990), to which it had referred above:
>
>> The government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry. 'This will not do.' *Johnson v. United States*, 333 U.S. at 17. *We must not shift the burden from the government—to show 'une-*

*quivocal and specific' consent—to the defendant, who would have to prove unequivocal and specific objection to a police entry, or be found to have given implied consent.* [Emphasis added.]

*Norris*, 338 Ark. at 409, 993 S.W.2d at 925-26 (quoting *Gonzalez*, 71 F.3d at 830).

It is this court's previous reliance on *Gonzalez* that the State now takes issue with. Specifically, the State points out that the Eleventh Circuit distinguished its holding in *Gonzalez* in the recent case of *United States v. Ramirez-Chilel*, 289 F.3d 744 (11th Cir. 2002). There, the Eleventh Circuit distinguished *Gonzalez* on the basis that the former case involved a situation where the defendant simply did not object to police entering the home, whereas in *Ramirez-Chilel*, the situation involved a defendant who opened the door and then stepped back to allow police to enter. In the latter case, the court found the entry to be legal because there was no official show of force that caused the defendant to allow the officers into his house.

We find the distinction drawn by the Eleventh Circuit to be immaterial to the case at hand. Here, the State failed to present any clear and positive testimony that any type of consent, verbal or otherwise, was obtained by officers before they entered Appellant's house. Here, Sanders's own testimony regarding how the officers came to be in the house varied from the *Denno* hearing to the second suppression hearing. Sanders initially stated that Arnold opened the door and the officers entered the house. It was not until a year later at the second hearing that Sanders added that Arnold opened the door and stepped back for the police to enter. Moreover, the testimony of Norris regarding the entry contradicts Sanders's testimony. When asked if Arnold gave any indication for the officers to come in, Norris replied, "No." Moreover, Arnold himself testified at the second suppression hearing that when he opened the door, he gave no indication for the police to enter; rather, they simply walked past him. Even viewing this evidence in a light most favorable to the State, we cannot say that the State met its burden on this point.

▋ Accordingly, the officers' warrantless entry into Appellant's home constituted a Fourth Amendment violation. The trial court, therefore, erred in denying Appellant's motion to suppress. In reaching this conclusion, it is unnecessary for us to consider the issue of whether Arnold possessed apparent authority to consent to the officers' entry. *See, e.g., Holmes*, 347 Ark. 530, 65 S.W.3d 860. Because we are reversing the trial court on this point, we need not address Appellant's other arguments on appeal.

Before concluding, we note that a copy of this opinion has been forwarded to this court's Committee on Professional Conduct. Appellant's counsel, R.S. McCullough, presented the barest of arguments on the issue of suppression and all subsequent points on appeal. In fact, the argument portion of his brief consists of less than five pages for five points on appeal. Moreover, it appears that McCullough failed to comply with this court's rules from the moment this appeal was filed. In the earliest stages of this appeal, McCullough filed a motion for rule on the clerk, because he failed to lodge the record with this court in a timely fashion. McCullough was then given two extensions to file his brief, and when he finally filed it on December 21, 2001, it was in an improper format. The Clerk gave him an additional seven days to refile a corrected brief. Then, on January 30, 2002, the State filed a motion requesting this court to require McCullough to submit a brief in compliance with this court's Ark. Sup. Ct. R. 4-3(h). After another two extensions, McCullough filed a revised brief. Obviously, this brief was insufficient, as the State filed a 178-page supplemental abstract. In sum, this sub-par work causes us great concern, particularly in a situation such as this one, where Appellant was sentenced to a term of life imprisonment.

Reversed and remanded.

BROWN, J., dissents.

ROBERT L. BROWN, Justice, dissenting. I disagree with the majority opinion for the sole reason that it reaches the merits of the appeal and reverses Latta's conviction when appellant's attorney has provided virtually no assistance to this court in the appellate process. Instead, the majority has relied on

the State's brief and its own research to reverse this case. The result of all this is that the principle of decision-making based on the adversary system has gone by the boards. I would expedite this case and require appellant's counsel to present this court with an appropriate brief, including a discussion of recent case authority directly on point (*Holmes v. State*, 347 Ark. 530, 65 S.W.3d 860 (2002)), before I reversed this case. If counsel failed to do so, I would hold him in contempt of court.

Recently, this court has taken to task attorneys who failed in their ethical duty to zealously represent their clients. In those cases, we ordered counsel to refile their opening briefs. *See, e.g, Ward v. State*, 347 Ark. 515, 65 S.W.3d 451 (2002) (finding abstract flagrantly deficient and ordering counsel to rebrief the matter); *Dansby v. State*, 347 Ark. 509, 65 S.W.3d 448 (2002) (finding abstract deficient and ordering counsel to refile his brief); *Brady v. State*, 346 Ark. 298, 57 S.W.3d 691 (2001) (ordering rebriefing in compliance with Ark. Sup. Ct. R. 4-3(j)(1)); *Dewberry v. State*, 341 Ark. 170, 15 S.W.3d 671 (2000) (ordering rebriefing in compliance with Ark. Sup. Ct. R. 4-3(j)(1)).

The Supreme Court of California has held that appellate counsel have certain obligations, which I find to be particularly relevant:

> We have recently set forth in detail the obligations of appellate counsel, including the duty to prepare a legal brief containing citations to the transcript and appropriate authority, and setting forth all arguable issues, and the further duty not to argue the case against his client.

*People v. Lang*, 11 Cal. 3d 134, 139, 520 P.2d 393, 396, 113 Cal. Rptr. 9, 12 (1974) (citations omitted). It is elementary that appellate counsel should file briefs which adequately present the issues, and more importantly, cite persuasive and controlling authority for a position. *See e.g., People v. Scott*, 64 Cal. App. 4th 550, 75 Cal. Rptr. 2d 315 (1998); *Smith v. State*, 496 So. 2d 971 (Fla. Dist. Ct. App. 1986). In addition, the Model Rules of Professional Conduct state that as an advocate, "a lawyer zealously asserts the client's position under the rules of the adversary system." Model

Rules of Professional Conduct, Preamble: A Lawyer's Responsibilities.

In this case, the majority has not only decided an issue which was not sufficiently presented to it, but has also relied on the State's brief for relevant caselaw (the State, of course, advocates affirmance). The majority then performed its own research in an effort to give the appellant favorable relief. We have said time and again that we will not do research or develop argument for an appellant. *See, e.g., Dixon v. State*, 260 Ark. 857, 862, 545 S.W.2d 606, 609 (1977) (stating, "In effect the court is asked to research the law and to hold in favor of the appellant if the result of our labor so demands. We must decline that invitation."). If we were to continue on the path established today, we would have no need for attorneys to represent appellants before this court, as we would essentially be representing them ourselves. Or, as occurred in this case, we would be allowing the State to present both sides of the argument.

I believe the time has come to remand woefully deficient briefs back to counsel for rebriefing. Appellate counsel must effectively represent their clients under Sixth Amendment guarantees. *See Howard v. State*, 291 Ark. 633, 727 S.W.2d 830 (1987). Providing a barebones, conclusory argument and failing to cite recent, controlling caselaw, (in this case, *Holmes v. State, supra*), falls far short of the standard. Indeed, appellant's counsel did not even file a reply brief in response to the State's brief which adduced a case directly on point.

Accordingly, appellant's counsel, R.S. McCullough, should be made to redo his opening brief and cite this court to authority for each point raised. I would give him fifteen days to do so and expedite the appeal once the brief is resubmitted. If he still failed in his duty, I would support the issuance of a show cause order for why he should not be held in contempt of court. The alternative is to allow abysmal appellate work to continue with a mere slap on the wrist as punishment. We should not allow this to occur, especially when the client has been sentenced to life in prison.

I respectfully dissent.