IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 17, 2020 at Knoxville

## STATE OF TENNESSEE v. TORSAUNT LAMONT SHANKLIN

**Appeal from the Circuit Court for Montgomery County**
**No. CC2018-CR-20     William R. Goodman III, Judge**

_____

### No. M2019-01896-CCA-R3-CD

_____

The Defendant, Torsaunt Lamont Shanklin, was charged with drug and firearm offenses after those items were discovered during a search of his motel room.  The Defendant filed a motion to suppress the evidence, arguing that the officers lacked probable cause for a search warrant based solely on the smell of marijuana coming from the room.  The trial court denied the suppression motion.  A jury convicted the Defendant of one count each of possession with the intent to manufacture, sell, or deliver twenty-six grams or more of cocaine, simple possession of marijuana, possession of drug paraphernalia, and possession of a firearm during the commission of or attempt to commit a dangerous felony, as well as three alternative counts of possession of a firearm by a convicted felon.  He received an effective thirty-five-year sentence.  On appeal, the Defendant challenges the denial of his motion to suppress.  After a thorough review of the record, we conclude that the Defendant is not entitled to suppression of the evidence, which was seized pursuant to a valid search warrant.  Accordingly, we affirm the trial court's judgments.  However, we remand this case for entry of corrected judgment forms as detailed in this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed;**
**Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Gregory D. Smith (on appeal), Clarksville, Tennessee, and Melissa A. King (at trial), Adams, Tennessee, for the appellant, Torsaunt Lamont Shanklin.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; John W Carney, Jr., District Attorney General; and Helen O. Young, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION
## FACTUAL BACKGROUND

On August 15, 2017, the Defendant was a guest in Room 225 of a Motel 6 in Clarksville. Around 6:30 a.m. that day, Clarksville Police Department ("CPD") officers Adam Noble and Tyler Weaver were present at the Motel 6 on an unrelated matter when they smelled marijuana emitting from the Defendant's room.[1] After the officers knocked on the door, the Defendant answered, and when he did so, the marijuana smell intensified. Though Officer Noble instructed the Defendant to step outside, the Defendant, instead, stepped back inside and attempted to the close the door. The Defendant was "redirected" back outside. Because the Defendant would not provide the officers with a clear answer of whether there were other occupants inside, Officer Weaver performed a protective sweep of the room. While this was occurring, the Defendant began walking backwards away from Officer Noble. Officer Noble demanded that the Defendant return; however, the Defendant "took off running." Officer Noble was able to apprehend the Defendant in a nearby stairwell.

Joshua Smith, a drug agent with the CPD, subsequently appeared on the scene, and he observed the motel room and spoke with Officers Noble and Weaver. Later that day, Officer Smith obtained a search warrant for the Defendant's motel room. In the affidavit in support of the warrant, Officer Smith stated as follows:

> On August 15, 2017, at approximately 06:30 hours, Officer Adam Noble and Officer Tyler Weaver of the Clarksville Police Department conducted a walkthrough of the Motel 6 parking lot (3080 Wilma Rudolph Boulevard). While walking near Room 225, Officers smelled the distinct odor of raw marijuana emitting from the doorway. They knocked on the door and made contact . . . . Officers smelled the odor of raw marijuana emitting from the interior of Room 225.

> While [the Defendant] was speaking with the Officers, he attempted to close the door on them. The Officers removed him from the room at which time he attempted to flee on foot, but he was taken into custody.

> While attempting to obtain consent from [the Defendant] to search the room, [the Defendant] stated that there was marijuana in a nightstand in the room, but he denied consent to search the entire room.

---

[1] We take this initial recitation of the facts from Officer Noble's arrest warrant, which charged the Defendant with evading arrest.

Officers conducted a protective sweep of the room to ensure no other person was hiding and/or possibly destroying evidence. During the protective sweep, in plain view, Officers observed cigarillos on a nightstand and tobacco remains in the trash.

Your Affiant arrived at Room 225 and smelled the distinct odor of raw marijuana emitting from the room.

Through training and experience, Officer Noble, Officer Weaver and your Affiant know the smell of both burnt and raw marijuana, all having made numerous arrests for marijuana possession. Your Affiant knows that subjects will use cigarillos to ingest marijuana, as they will split the cigarillo open, remove the tobacco and refill it with marijuana.

A check of [the Defendant's] criminal history revealed that he has fourteen prior arrests for Drugs-Schedule II, Drugs-Schedule VI and Simple Possession since 2006.

Officer Smith also detailed his experience and training in the affidavit.

During the search, drugs and a handgun were discovered in the Defendant's room. Thereafter, a Montgomery County grand jury returned a ten-count indictment against the Defendant, charging him with one count each of possession of twenty-six grams or more of cocaine with the intent to sell, manufacture, or deliver; possession of more than one-half ounce of marijuana with the intent to sell, manufacture, or deliver; simple possession of marijuana; possession of drug paraphernalia; theft of property valued at $1,000 or less; evading arrest; and possession of a firearm during the commission of or attempt to commit a dangerous felony, as well as three alternative counts of possession of a firearm by a convicted felon. See Tenn. Code Ann. §§ 39-14-103, -16-603, -17-417, -17-418, -17-425, -17-1307, -17-1324.

Prior to trial, the Defendant filed a motion to suppress the evidence. In the motion, the Defendant claimed that he was asleep when the officers knocked on the door and noted that the room was not his, but registered to one Ashley Fitts. He argued that "there was no probable cause to search and no consent given" and that therefore, "the subsequent search by the officer [was] an illegal warrantless search and any evidence obtained pursuant to the illegal search should be suppressed."[2] The State filed a reply, relying on the "four corners

_____

[2] The Defendant also challenged the search of his vehicle that was parked outside the motel room and the subsequent search of his storage unit. However, because the Defendant was not charged with any offense based upon evidence found therein, we will limit our discussion to the facts and arguments surrounding the motel room.

of the search warrant," and submitting that "sufficient probable cause existed for the issuance of said warrant."

On October 8, 2018, a hearing was held. The parties did not present any evidence, though they discussed the facts contained in Officer Noble's affidavit in support of the evading arrest charge.[3] Defense counsel argued that the Defendant had an expectation of privacy in the motel room and that the officers "had no right to be outside of [the Defendant's] room."

After argument, the trial court issued an oral ruling denying the motion. The trial court first determined that there was no expectation of privacy in the area outside of the Defendant's motel room. The trial court then noted that the officers detected the odor of marijuana and proceeded to get a search warrant. Finally, the trial court reviewed the information contained in the search warrant affidavit and found that the information, under the totality of the circumstances, supported probable cause for the issuance of a warrant to search the motel room. The trial court entered an order denying the motion on October 29, 2018. The Defendant proceeded to trial.

At trial, both Officers Noble and Weaver testified. Around 6:30 a.m. on August 15, 2017, Officers Noble and Weaver, dressed in uniform, went to execute an arrest warrant at a Motel 6 in Clarksville. According to Officer Noble, he had "received some information from an officer in another district about a person who possibly had a warrant staying at that hotel." The officers parked at a nearby gas station in order not to alert the person whom they were seeking of their presence, so there was no recording of the events that followed.

It was "just becoming daylight" when the officers arrived at the motel. As the officers crossed the parking lot of the motel looking for the arrest warrant suspect's vehicle, they smelled the odor of marijuana near the building. The doors of the motel rooms opened to the parking lot, so the officers went from door to door "smelling doors," trying to locate the source of the marijuana. Officer Noble explained that they would smell "the door crack where [the door] would open." After checking the rooms on the first floor in the vicinity of the odor, they proceeded to the second floor, where they were able to determine that the smell was emanating from inside Room 225 on the corner.

They knocked on the door a couple of times over the course of about a minute before the Defendant opened the door; when he did so, the smell intensified. The officers confirmed that they did not know to whom the motel room was rented at that time, and they could not recall if they identified themselves as police while knocking. Officer Noble said that the Defendant was dressed in basketball shorts and a white tank top and that he

---

[3] There were three different arrest warrants in this case, but only Officer Noble's affidavit in support of the evading arrest charge provided context for the issues presented.

appeared as though he might have been sleeping. The officers told the Defendant that they "were there because of the odor and that [the Defendant] needed to step outside and talk to" them. The Defendant was argumentative about the officers' "being there just over the smell of weed coming from the room," and he stepped back inside and attempted to shut the door. Officer Noble put his foot between the door and the door frame, and Officer Weaver grabbed the Defendant's wrist and escorted him outside into the breezeway. Officer Noble explained, "And once [the Defendant] was there and trying to shut [the door], [they] felt the need to bring [the Defendant] out [them]selves to deal with it." Though the Defendant was not under arrest at that time, he was not free to leave either.

Because the Defendant was "continuously argumentative" and would not say if anyone else was inside the motel room, Officer Weaver performed a protective sweep of the room to ensure their safety while they talked to the Defendant, as well as to prevent the destruction of any evidence. Officer Noble stayed outside with the Defendant. Both officers confirmed that the Defendant did not give consent to search the motel room.

After Officer Weaver went inside the motel room with his pistol drawn, Officer Noble told the Defendant to wait next to him in the breezeway and not to leave, but the Defendant backed away and then ran down a nearby stairwell. Officer Noble estimated that the top of the stairwell was approximately five yards away from the motel room. Officer Noble chased the Defendant down the stairs and held him on the ground. Officer Weaver said that about five seconds after he had entered the motel room, he heard the commotion, left the motel room, and helped Officer Noble secure the Defendant. The Defendant was placed in handcuffs.

Because Officer Weaver was unable to complete the protective sweep prior to assisting Officer Noble in the stairwell, Officer Weaver returned to the motel room to continue with the sweep. Officer Weaver estimated that he was out of view of the motel room for around thirty seconds. Upon conducting the protective sweep, which took between ten to fifteen seconds to complete, Officer Weaver did not find anyone else inside the room. He opined that only the Defendant was staying in the room.

During the sweep, Officer Weaver saw in plain view "dryer sheets stuffed in the air conditioner by the front door," the "guts" of cigarillos in the trash can, and a pack of cigarillos lying on the nightstand. Officer Weaver explained that although cigarillos usually contained tobacco, drug users often emptied the "guts" of a cigarillo and refilled it with marijuana to smoke. In addition, according to Officer Weaver, during their interaction with the Defendant, the Defendant mentioned that all this was taking place over "a blunt," and the Defendant admitted that there was "some marijuana" in the drawer of the nightstand.

- 5 -

Officer Smith also testified. He confirmed that he arrived on the scene and that after being briefed by the officers, a decision was made to obtain a search warrant for the motel room, which he did. Officer Smith indicated that regardless of the items observed during the protective sweep, "the overwhelming probable cause" to search was based upon "[t]he smell[,] the strong smell of raw marijuana" coming from the room. Officer Smith believed that the smell alone was sufficient to secure a search warrant.

Inside the motel room, the officers found twenty-one baggies of cocaine, seven baggies of marijuana, three digital scales, a loaded 9mm handgun, and a number of cellular telephones. They also found a spoon with cocaine residue inside of a condiment container. There were two boxes of plastic sandwich bags, one of which was unopened. There were also plastic sandwich bags with torn-off corners, which were often used in the process of packaging drugs for resale, according to Officer Smith. Officer Smith also indicated that the portions of the cigarillos found in the motel room appeared to have been used as a wrapper for smoking marijuana; partially smoked blunts were observed in the ashtray.

Men's clothes were found hanging in the closet and inside a television stand drawer; Officer Smith did not observe any women's clothes in the motel room. The Defendant's wallet, which contained his driver license and his social security card, was found in the nightstand, and a total of $2,100 was found inside the room.

Paperwork with the Defendant's name on it was located inside the room, including a receipt from an eyeglass store and papers for a U-Haul storage unit. The storage unit papers bore both the Defendant's name, as well as the name of one Ashley Fitts; the Defendant later identified Ms. Fitts as his girlfriend. Officer Smith stated that they were able to ascertain that the motel room had been rented to Ms. Fitts for approximately two weeks and that the Defendant was specifically listed as a guest on the paperwork. There was also a "body cleanser" discovered in the motel room, which Officer Smith said was commonly used by an individual in an attempt to deceive a drug test.

The officers found a composition book that appeared to serve as a business ledger for the Defendant's drug-dealing operation; however, Officer Smith conceded that handwriting on documents found inside the motel room was not entirely consistent. Officers Smith explained that drug dealers often used multiple phones in their operations, and he opined that many of the individually-wrapped baggies that contained drugs found inside the Defendant's motel room appeared to be ready for resale.

The officers also found two boxes of latex gloves, which, according to Officer Smith, were commonly used by drug dealers to avoid leaving fingerprints on the plastic bags. In addition, there was a bottle of Inositol found in the same bag as the handgun, and in the mini-refrigerator, the officers located baking soda. According to Officer Smith, baking soda was commonly used by drug dealers to convert powder cocaine to crack

cocaine, and Inositol was a cutting agent commonly used by drug dealers to dilute cocaine. Finally, Officer Smith stated that dryer sheets were sometimes stuffed inside air vents in an effort to mask the odor of a controlled substance.

The Defendant's father, who was a painter by profession, told Officer Smith that the Defendant worked for him, though the Defendant's father would not provide any details of that employment. Two pay stubs for the Defendant were entered into evidence, which reflected pay for periods ending September 25, 2016, and October 2, 2016. Also, the Defendant's 2016 W-2 was entered into evidence and reflected total earnings of $4,441.50 for the year.

Tennessee Bureau of Investigation Crime Lab Agent Lela Jackson tested the drug items found in the Defendant's motel room. The portion of the marijuana she tested weighed 6.68 grams and the cocaine portion weighed 26.35 grams. There was also a mixture of baking soda and cocaine that weighed 19.93 grams. She did not test the entirety of the drugs given to her.

The Defendant did not have anything incriminating on his person or in his vehicle at the time of his arrest. Following the Defendant's arrest, William Evans, a drug agent with the CPD, interviewed the Defendant at the police station beginning at 7:01 p.m. on August 15, 2017. The Defendant verbally waived his Miranda rights at the outset of the interview. During the interview, which was recorded and played for the jury, the Defendant disputed the amount of cocaine that was in the motel room, but he admitted that he both used and sold cocaine. He also admitted that he had smoked marijuana in the motel room and that the gun belonged to him. In addition, the Defendant asserted that other people in the area of his motel room were smoking marijuana. The Defendant also mentioned being employed by "Rainbow Company," as well working with his father. Regarding Ms. Fitts, the Defendant said "something to the effect that she had dipped, as in, she had left the room." When asked if his motel room had been paid for in full, the Defendant said that he got arrested before he could "go pay it for the day." He denied knowing what Inositol was used for in the drug-making process.

That concluded the State's proof. The Defendant moved for a judgment of acquittal focusing on the suppression issues. First, the Defendant argued that "[b]ecause the officer did not have probable cause to arrest the [D]efendant before [the officer] invaded an area where the [D]efendant had a legitimate expectation of privacy, the subsequent arrest and seizure of all evidence [was] invalid." The Defendant continued,

> From the affidavit, there was nothing more than cigarillo packages on the nightstand. Assuming that the search warrant for Room 225 is valid, the search is where the product of an unlawful initial intrusion of Room 225 puts

off the fruits of all search warrants and should have been suppressed and this matter dismissed.

The trial court noted that the suppression issue had been previously addressed and denied the motion for a judgment of acquittal.

The Defendant did not present any proof, and that concluded the proceedings during the first part of bifurcated guilt phase. Five counts were submitted to the jury for their consideration.[4] Then, during the second part of the bifurcated guilt phase, proof regarding the three alternative counts of possession of a firearm by a convicted felon was received, and those counts were presented to the jury. Ultimately, the Defendant was convicted of possession with intent to manufacture, sell, or deliver twenty-six grams or more of cocaine, simple possession of marijuana, possession of drug paraphernalia, and possession of a firearm during the commission of or attempt to commit a dangerous felony. He was also found guilty of the three alternative counts of possession of a firearm by a convicted felon. He was acquitted of evading arrest. The trial court merged the convictions for possession of firearm by a convicted felon, and it imposed a total effective sentence of thirty-five years in prison as a career offender.

The Defendant filed a motion for new trial, again raising the suppression issue. The Defendant argued that he was unlawfully arrested when the officers removed him from his motel room and that the officers improperly obtained the search warrant using information gained during the subsequent protective sweep. The trial court again relied on its prior suppression ruling and denied the Defendant's motion for new trial. He filed an appeal to this court.

## ANALYSIS

The Defendant asserts that "there was no probable cause for the initial warrantless search of Room 225." He submits that his constitutional rights were violated when the officers knocked on his motel room door relying on "a bald claim of smelling marijuana" after "sniffing at motel doors." The Defendant maintains, "This is not how an orderly society chooses to allow police to function. In a world where police excesses are producing calls to defund whole police forces, rules of engagement must be both clear and followed."

The Defendant then proceeds to discuss what he considered an arrest when the officers forced him outside of his motel room, submitting that he believed he was under arrest at that time despite any testimony by the officers to the contrary. The Defendant notes that Tennessee Code Annotated section 40-7-103(a)(2) limits a police officer's right

---

[4] The charges of theft of property and possession of more than one-half ounce of marijuana with intent to manufacture, sell, or deliver were never presented to the jury for their consideration.

to execute a warrantless arrest to situations when a misdemeanor occurs or is threatened in the officers' presence, as well as noting that testimony established he appeared to have been asleep just before he opened the door. The Defendant cites law from other states for the proposition that "police cannot use a bogus or pretextual misdemeanor arrest to justify a search." The Defendant concludes, "Since the only basis for the detention, search, arrest and even knocking on the door of Room 225 was the smell of marijuana through a closed door, the only thing police had as probable cause was a misdemeanor occurring outside the officers' presence." Therefore, in the Defendant's opinion, the evidence should have been suppressed, and his case dismissed.

The State responds that the officers lawfully searched the Defendant's motel room pursuant to a search warrant based on probable cause. According to the State, though the Defendant had a reasonable expectation of privacy in his motel room, he did not have any reasonable expectation of privacy "in any other portion of the motel property open to the public." The State maintains that the officers "were lawfully present in the motel's parking lot and in the breezeway." The State continues that the protective sweep was valid because the officers had a least a reasonable suspicion to detain the Defendant and investigate further after they smelled marijuana in the area of the Defendant's room, a smell that intensified after the Defendant voluntarily opened his motel room door, and after the Defendant refused to say if anyone else was in the room. According to the State, the Defendant could be arrested for a misdemeanor because the officers had probable cause for an arrest after the Defendant ran away and they believed that he possessed marijuana based on the strong odor coming from the motel room. The State continues, "[E]ven if [the Defendant] should not have been arrested, he cannot avail himself of the exclusionary rule because only evidence, not an arrest, can be suppressed." The State notes that no evidence was seized during the protective sweep and concludes that the search warrant was based on probable cause and that the trial court properly denied the Defendant's suppression motion.

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008) (citing State v. Scarborough, 201 S.W.3d 607, 615 (Tenn. 2006)). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. (citing State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007)). Conversely, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any

presumption of correctness. Id. (citing State v. Hayes, 188 S.W.3d 505, 510 (Tenn. 2006)). In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures by law enforcement officers. We begin our review by observing that "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). That is, a trial court necessarily indulges the presumption that a warrantless search or seizure is unreasonable, and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure. Id. Hotel and motel guests' right to privacy in their rooms is also protected by the Fourth Amendment. State v. Ross, 49 S.W.3d 833, 840 (Tenn.2001); see also Hoffa v. United States, 385 U.S. 293, 301 (1966).

Reasonableness is the "touchstone of the Fourth Amendment." Florida v. Jimeno, 500 U.S. 248, 250 (1991). Though the Defendant had an expectation of privacy inside his motel room, the central issue in this case is whether the Defendant had a reasonable expectation of privacy in the common areas of the motel, specifically the breezeway. Neither the Fourth Amendment nor article 1, section 7 of our constitution precludes governmental intrusion absent the reasonable expectation of privacy. State v. Talley, 307 S.W.3d 723, 733-34 (Tenn. 2010) (citing Minnesota v. Dickerson, 508 U.S. 366, 375 (1993); State v. Munn, 56 S.W.3d 486, 494 (Tenn. 2001)). In consequence, "an investigation by governmental authorities which is not a search as defined by the Supreme Court may be conducted without probable cause, reasonable suspicion or a search warrant." State v. Bell, 832 S.W.2d 583, 58-90 (Tenn. Crim. App. 1991).

In the determination of whether a search or seizure meets constitutional standards, the first consideration is whether the accused has a reasonable expectation of privacy. See Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). In Katz, a two-prong test was established: "(1) whether the individual had an actual, subjective expectation of privacy and (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances." Munn, 56 S.W.3d at 494 (citing Smith v. Maryland, 442 U.S. 735, 740 (1979)). A defendant has the initial burden of establishing a legitimate expectation of privacy, and the failure to do so is dispositive in favor of the State. Talley, 307 S.W.3d at 730.

The general rule regarding dwellings such as apartment buildings and motels is that an occupant has no legitimate expectation of privacy in areas subject to common use. See Wayne R. LaFave, Search and Seizure § 2.3(c), at 758-62 (5th ed. 2012). This rule applies to external and internal hallways, even those immediately adjacent to private areas such as individual apartments and motel rooms. Id.

In Talley, the Tennessee Supreme Court upheld this court's decision "rejecting the Sixth Circuit bright-line rule that a resident always has a reasonable expectation of privacy in a secured common area" in favor of "the totality of the circumstances test . . . for determining the reasonableness of an expectation of privacy." 307 S.W.3d at 734. Applying this test, the court held that "the [d]efendant [resident] did not have a reasonable expectation of privacy in the commonly shared, interior hallway of a condominium complex" because no resident "could unilaterally exclude others rightfully within the hallway," residents had collectively allowed non-residents to have intermittent access to the common areas, and there was "no evidence that the [d]efendant had taken any precautions to maintain his privacy in the common areas of the building." Id. at 734-35. The court noted that "[a]s a general rule, unlocked or unsecured common areas of apartment buildings do not qualify for any reasonable expectation of privacy." Id. 307 S.W.3d at 732 n.4 (citations omitted).

Under the totality of the circumstances, we see no need to depart from the general rule in this case. The breezeways belonged to the motel owner, not the occupants of the individual rooms, and no evidence indicated that the police lacked permission to be present on the breezeways. The Defendant had a possessory interest in the room itself, but as to the breezeway, his interest, like that of the other motel guests, was one of common, not exclusive, use and access. See United States v. Miravalles, 280 F.3d 1328, 1332 (11th Cir. 2002) (reasoning that common areas in an apartment building are available for the use of other tenants, visitors of other tenants, the landlord, delivery people, repair workers, and the like). The outside walkway of a motel, unlike a traditional curtilage, frequently must be traversed at all hours by strangers, including guests and hotel staff. Although the Defendant had a reasonable expectation of privacy inside the room he rented, he had no expectation of privacy in the sights, sounds, and smells detectible without unconstitutional intrusion from outside the room. Accordingly, the presence of law enforcement officers on the motel breezeway was not a search within the meaning of the Fourth Amendment. See e.g., Sanders v. Commonwealth, 772 S.E.2d 15, 23-24 (Va. Ct. App. 2015) (holding same).

Moreover, we find no legal justification for a conclusion that the officers' smelling the motel doors somehow converted their presence into an unlawful search. The law is well established that a canine sniff, standing alone, is not a search for purposes of the Fourth Amendment. See, e.g., Illinois v. Caballes, 543 U.S. 405, 410 (2005); United States v.

Place, 462 U.S. 696, 707 (1983). Key to the decisions in those cases was that each law enforcement officer and his trained dog were at a location in which they had a right to be at the time of the sniff and alert. Certainly if a canine sniff is not a search for purposes of the Fourth Amendment, then neither is a police officer's. See Sanders, 772 S.E.2d at 25 (holding that no search occurred because the police officers and the drug detection dog were at a place in which they had a right to be at the time of each sniff). Thus, the officers' smelling the door jambs under the circumstances of this case did not violate the Defendant's reasonable expectation of privacy. See United States v. Roby, 122 F.3d 1120, 1124-25 (8th Cir. 1997) (approving a dog sniff in the common corridor of a hotel); United States v. Marlar, 828 F. Supp. 415, 419 (N.D. Miss. 1993) (approving a dog sniff of an exterior motel room door opening onto a public sidewalk and parking lot); Nelson v. State, 867 So.2d 534, 535-37 (Fla. Dist. Ct. App. 2004) (approving a dog sniff of a hotel hallway); State v. Washburn, 685 S.E.2d 555, 558-60 (N.C. Ct. App. 2009) (approving a dog sniff in the common hallway of a storage facility).

Seemingly, the Defendant contends that even if the officers were lawfully present in the breezeway, they were still prohibited from knocking on his door, detaining him, and conducting a protective sweep of the room based solely on the smell of marijuana; thus, according to the Defendant, the evidence should have been suppressed as fruit of the poisonous tree. However, law enforcement officers are not required to seek a search warrant, even if there might be sufficient information and ample time to do so, before they conduct a knock and talk investigation. Florida v. Jardines, 569 U.S. 1, 8 (2013). Courts have generally recognized the right of police officers to enter portions of a person's property that are implicitly open to the public for purposes of seeking consent to perform a search. State v. Cothran, 115 S.W.3d 513, 522 (Tenn. Crim. App. 2003). In explaining the procedure and reasoning for it, this court has quoted with approval the following:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof-whether the questioner be a pollster, a salesman, or an officer of the law.

Id. at 521 (quoting United States v. Cormier, 220 F.3d 1103, 1109 (9th Cir. 2000)). The knock and talk procedure is generally regarded as a consensual encounter. Id. (citing Latta v. State, 88 S.W.3d 833, 838 (2002)). Moreover, no basis for suspecting a crime is being committed, neither reasonable suspicion nor probable cause, is required by officers before they can engage in a consensual encounter like the knock and talk. Id. Here, the officers,

- 12 -

who were in a place that they had a right to be present, were not constitutionally prohibited from knocking on the Defendant's motel room door.

The Defendant's argument fails to account for what happened next—the fact that the evidence from his motel room was seized pursuant to a search warrant. The officers smelled marijuana emitting from the Defendant's room before they knocked on the door, and the smell only got stronger when the Defendant opened the door. The odor of an illegal substance alone can provide sufficient probable cause for the issuance of a search warrant. State v. Donte Lavon Green, No. W2018-00092-CCA-R3-CD, 2019 WL 1595684 (Tenn. Crim. App. Apr. 15, 2019) (finding probable cause supported the search warrant after law enforcement was called to the motel due to the smell of marijuana, approached the defendant's door, the defendant opened the door, and an "[o]fficer immediately smelled the strong odor of what he believed to be raw marijuana coming from the room"), perm. app. denied (Tenn. Aug. 16, 2019); State v. Billy Joe Hodge, No. W2016-01009-CCA-R3-CD, 2017 WL 4004229, at *6 (Tenn. Crim. App. Sept. 8, 2017) (noting that "probable cause can be based solely on an officer's detection of the odor of marijuana" and concluding that the smell of marijuana from a residence provided probable cause for the search); State v. Frederic A. Crosby, No. W2013-02610-CCA-R3-CD, 2014 WL 4415924, at *8 (Tenn. Crim. App. Sept. 9, 2014) (determining that the smell of marijuana emanating from a person provided probable cause to search); State v. Bradley Lonsinger, No. M2003-03101-CCA-R3-CD, 2005 WL 49569, at *5 (Tenn. Crim. App. Jan. 5, 2005) ("It is well established in Tennessee that the odor of an illegal substance, either alone or in conjunction with other facts and circumstances, can provide sufficient probable cause, depending on the situation, for either a warrantless search or the issuance of a search warrant.").

In the interest of brevity, and because the evidence was obtained following the issuance of a search warrant, we decline to delve into the Defendant's less than clear allegations regarding his subsequent detention and the protective sweep of the motel room, which occurred after the Defendant opened his motel room door to speak with the officers. We do so without deciding the merits of those allegations because the legality of the initial entry and the Defendant's detention are not dispositive of the suppression issue. Moreover, even if we were to accept the Defendant's legal challenges to his initial detention and the protective sweep, they would not entitle him to the relief he seeks.

Pursuant to the independent source doctrine, evidence is still admissible if the government obtained that evidence via an independent legal source, like a warrant. See State v. Carter, 160 S.W.3d 526, 532 (Tenn. 2005); see also Donte Lavon Green, 2019 WL 1595684, at *6. No evidence was seized during the protective sweep or from the Defendant's initial detention or subsequent arrest. When the Defendant was detained and the officers performed the protective sweep of the Defendant's motel room, the officers

- 13 -

already had ample information to obtain a search warrant. The Defendant does not make any specific challenges to the validity of this search warrant on appeal.

In analyzing the validity of a search pursuant to a warrant, a court may redact an affidavit to remove any references to tainted information that was illegally obtained, and "any resulting search is deemed constitutional so long as the redacted affidavit has been properly scrutinized and still suffices to establish probable cause." State v. Randall Keith Smith and Nicholas Ryan Flood, No. W2009-02678-CCA-R3-CD, 2011 WL 6885348, at *7 (Tenn. Crim. App. Dec. 27, 2011). Even if we redact the search warrant and remove from our probable cause analysis any reference to the Defendant's flight and any subsequent observations by the officers during the protective sweep, the search warrant was still supported by probable cause. See Donte Lavon Green, 2019 WL 1595684, at *6.

Besides any allegedly tainted evidence, the affidavit recited that Officers Noble and Weaver were conducting a walkthrough of the Motel 6 parking lot and that while they were walking near Room 225, the officers "smelled the distinct odor of raw marijuana emitting from the doorway." The officers then knocked on the door and made contact with the Defendant, and they "smelled the odor of raw marijuana emitting from the interior of Room 225." While speaking with the Defendant and attempting to obtain consent to search the room, the Defendant stated that there was marijuana in a nightstand in the room. Officer Smith stated that when he arrived on the scene of Room 225, he likewise "smelled the distinct odor of raw marijuana emitting from the room." Accordingly, there was probable cause to support the search warrant even if we were to remove any references to the allegedly tainted evidence—a search that ultimately resulted in the recovery of the marijuana, cocaine, plastic bags, scales, $2,100 in cash, baking soda, Inositol, and a handgun. We conclude that the evidence was admissible because it was obtained pursuant to a valid search warrant. The trial court did not err by failing to suppress the evidence.[5]

Upon our review of the appellate record, the record does not explain disposition of the charges of theft of property or possession of more than one-half of ounce of marijuana with intent to manufacture, sell, or deliver. A complete judgment form for each count of the indictment is required by law. See State v. Berry, 503 S.W.3d 360, 364 (Tenn. 2015) (Order). The trial court should, on remand, enter judgment forms reflecting the disposition of all counts of the indictment. We also note that an amended judgment form for Count 2 was entered reflecting that Counts 6, 7, and 8 (the three alternative counts of possession of a firearm by a convicted felon) "were merged" into Count 2 (possession of a firearm during

---

[5] In a footnote, the Defendant submits that his argument "will somewhat double as a sufficiency of evidence argument." Any argument by the Defendant regarding sufficiency of the evidence focuses solely on the suppression of the evidence. Because we have held that the trial court did not err in admitting the evidence, we fail to indulge the Defendant's sufficiency argument any further.

the commission of dangerous felony). However, in the initial set of forms, a judgment was entered for Count 8, and it reflected that Counts 6 and 7 merged with Count 8. We find that the initial judgment forms correctly reflected the trial court's sentencing decision.[6] Those forms too shall be revised upon remand.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgments of the trial court. However, this case is remanded for entry of corrected judgment forms consistent with this opinion.

_____
D. KELLY THOMAS, JR., JUDGE

---

[6] Initially, the trial court said that Counts 6, 7, and 8 merged with Count 2. However, it then corrected itself and merged Counts 6 and 7 with Count 8, imposed a thirty-year sentence for Count 8, and ran the sentence concurrently with Count 1.